

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Mario García Colón<br><br>Peticionario | Certiorari<br><br>2011 TSPR 83<br><br>182 DPR _____ |

Número del Caso:   CC        - 2009 - 912

Fecha: 9 de junio de 2011

Tribunal de Apelaciones:

Región Judicial de Aibonito

Panel integrado por su presidente el Juez Escribano Medina, el Juez Miranda de Hostos y el Juez Aponte Hernández

Abogados de la Parte Peticionaria:

Lcdo. Martín G. González Vélez
Lcdo. Martín González Vázquez

Oficina de la Procuradora General:

Lcdo. Reinaldo Camps del Valle

Materia:     Alteración a la Paz

Este documento constituye un document          o oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Certiorari

El Pueblo de Puerto Rico
        Recurrido

        v.                    CC-2009-0912

    Mario García Colón
        Peticionario

Opinión del Tribunal emitida por el Juez Asociado Señor Rivera García

En San Juan, Puerto Rico, a 9 de junio de 2011.

El recurso de *certiorari* de epígrafe nos brinda la oportunidad de examinar, por primera ocasión, la constitucionalidad del delito de alteración a la paz según tipificado en el Artículo 247 del Código Penal de 2004, 33 L.P.R.A. sec. 4875. Asimismo, debemos determinar si el delito de alteración a la paz en su modalidad de expresiones de riña -inciso (c) del Art. 247, *supra*- se configura cuando la persona receptora de las manifestaciones proferidas es un policía en el ejercicio de sus funciones. Contestamos ambas interrogantes en la afirmativa.

I

El 15 de noviembre de 2006 el Sr. Mario García Colón (el peticionario) fue detenido por dos agentes de la Policía de Puerto Rico, Ángel González Aponte y Omar Rivera Colón, mientras conducía un vehículo de motor en el Municipio de Coamo. Los agentes indicaron que la intervención se debió a la alegada falta del peticionario en guardar la distancia apropiada entre vehículos; acción que infringía el Artículo 10.10 de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 22 del 7 de enero de 2000, según enmendada, 9 L.P.R.A. sec. 5290.

Una vez el peticionario hizo entrega de la licencia de conducir y del registro del vehículo, el agente González Aponte expidió el boleto administrativo y le requirió que lo firmara. El peticionario se negó a firmar el boleto, por lo que el agente González Aponte hizo la anotación correspondiente en el boleto y se lo entregó junto con los documentos. De inmediato, el peticionario se bajó del vehículo y le expresó a los agentes –mientras le apuntaba con el dedo índice- que eran "unos charlatanes, corruptos y que no [valían] nada".[1]

Ante tal situación, los agentes González Aponte y Rivera Colón alegaron que se sintieron ofendidos y sumamente molestos por las actuaciones del peticionario.[2] Así, el primero llamó a su supervisor, el sargento Pedro

_____

[1] Transcripción de la prueba, págs. 72, 95-96.

[2] Íd., págs. 72, 97.

Pagán Matos, para informarle lo sucedido. Cuando este último se personó en la escena y comenzó a explicarle al peticionario el procedimiento para impugnar el boleto de tránsito, el peticionario volvió a llamar charlatanes y corruptos a los agentes que intervinieron con él. Por tal motivo, el sargento Pagán Matos le expidió una citación para que compareciera el 28 de noviembre de 2006 al Tribunal de Primera Instancia.[3]

El 21 de noviembre de 2006, el peticionario solicitó revisión del boleto de tránsito. En febrero de 2007 el Tribunal de Primera Instancia declaró ha lugar la petición de revisión y ordenó el archivo del boleto.

Mientras tanto, en mayo de 2007, se presentaron sendas denuncias en contra del peticionario por dos violaciones al Artículo 247 del Código Penal de 2004, *supra*, sobre el delito de alteración a la paz. Allí se le imputó haber violado la paz de los agentes González Aponte y Rivera Colón al señalarles con el dedo e indicarles que eran unos charlatanes, corruptos y que no valían nada.[4] Posteriormente, durante una vista celebrada en febrero de 2008, la defensa presentó dos mociones en solicitud de desestimación al amparo de las Reglas 64(n)(2) y 64(a) de Procedimiento Criminal, 33 L.P.R.A. Ap. II, R. 64(n)(2) y 64(a).

---

[3] La citación expedida fue por infracción al Artículo 252 del Código Penal de 2004, 33 L.P.R.A. sec. 4880, sobre el delito de resistencia u obstrucción a la autoridad pública. En ella se le apercibía al peticionario que de no asistir a la citación, procederían con su arresto.

[4] Denuncias de 29 de mayo de 2007, Apéndice del recurso, págs. 238-239.

Así las cosas, en octubre de 2008 se celebró el juicio en su fondo. Al inicio de la audiencia, el tribunal denegó la solicitud de desestimación de las denuncias luego de recibir prueba pertinente sobre el asunto. Finalmente, el 14 de octubre de 2008 el foro de primera instancia declaró al peticionario culpable de los dos cargos imputados. En consecuencia, por cada cargo le impuso una pena de $200 -equivalente a ocho días multa a razón de $25 por día-, más las costas del litigio y un comprobante de $100 para el Fondo a Víctimas del Crimen.[5]

Inconforme, el peticionario acudió al Tribunal de Apelaciones mediante un recurso de apelación. Alegó que el foro primario incidió al no desestimar la denuncia por no haber sido presentada dentro de los 60 días siguientes al arresto o citación del peticionario, según exige la Regla 64(n)(2) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 64(n)(2). También señaló que el Tribunal de Primera Instancia erró al negarse a decretar la inconstitucionalidad del Artículo 247 del Código Penal, *supra*, por adolecer de amplitud excesiva. Por último, arguyó que su culpabilidad no fue probada más allá de duda razonable.

Mediante Sentencia emitida el 31 de agosto de 2009, el Tribunal de Apelaciones confirmó el dictamen del foro primario.[6] Respecto a la desestimación de las denuncias,

---

[5] Sentencias de 14 de octubre de 2008, Apéndice del recurso, págs. 41-44.

[6] El Juez Aponte Hernández disintió sin opinión escrita.

el foro apelativo intermedio indicó que la prueba reflejaba que tanto el peticionario como el sargento Pagán Matos acudieron al tribunal el 28 de noviembre de 2006 -día señalado en la citación entregada al peticionario el día del incidente-, pero las denuncias no pudieron ser presentadas debido a la falta de secretarias para procesarlas.[7] Añadió que el sargento intentó acordar en varias ocasiones una nueva fecha con la defensa del peticionario, pero sus gestiones fueron en vano. Ante tales circunstancias y el hecho que las denuncias fueron sometidas por un delito diferente a aquel señalado en la citación expedida por el sargento, el Tribunal de Apelaciones concluyó que no se había violado el derecho a juicio rápido del peticionario.

En cuanto al planteamiento constitucional, el foro apelativo intermedio decretó la constitucionalidad del Artículo 247 del Código Penal, *supra*, pero analizada desde la perspectiva de la doctrina de vaguedad. Razonó, de forma escueta, que la doctrina de vaguedad únicamente requiere que la ley dé un aviso razonable de la conducta prohibida y la pena que acarrea. Finalmente, expresó que la evidencia desfilada en el juicio probó más allá de duda razonable que el peticionario había incurrido en el delito de alteración a la paz. A esos efectos, especificó que "[e]l hecho de que las partes perjudicadas sean agentes

---

[7] Es pertinente aclarar que la falla del Estado en procesar las denuncias se debió a la falta de secretarias que las prepararan en el cuartel de la policía. Véase, Transcripción de la prueba, pág. 13.

del orden público *no significa que estén obligados a soportar toda clase de insultos y faltas de respeto por parte del público*".[8] (Énfasis en el original.)

Aún inconforme, el peticionario acude ante este Foro mediante el recurso de *certiorari* de epígrafe en el cual formula el señalamiento de error siguiente:

> **Erró crasamente el Honorable TA [sic.] al confirmar las sentencias apeladas. El hecho de que uno de los tres (3) jueces que intervinieron en la decisión aquí recurrida disienta, es indicativo de que el caso no se probó más allá de duda razonable y de que se castigó penalmente el derecho a la libre expresión.** (Énfasis suprimido y suplido.)

El 9 de abril de 2010 emitimos una Resolución en la cual le concedimos término a la Procuradora General para que mostrara causa por la cual no debíamos expedir el auto solicitado y revocar la Sentencia recurrida. En cumplimiento con lo ordenado, la Procuradora General presentó su alegato.

Así, pues, con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II

### A

El Artículo II, Sección 11 de nuestra Constitución consagra el derecho de todo acusado de delito a un juicio rápido. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo

---

[8] Sentencia de 31 de agosto de 2009, Apéndice del recurso, págs. 3-18.

1.[9]   Uno de los fines principales de este derecho es proteger los intereses del acusado, a saber: (1) prevenir su detención opresiva y perjuicio; (2) minimizar sus ansiedades y preocupaciones; y (3) reducir las posibilidades de que su defensa se afecte. Pueblo v. Rivera Santiago, 176 D.P.R. 559, 570 (2009); Pueblo v. Miró González, 133 D.P.R. 813, 818 (1993); Pueblo v. Rivera Tirado, 117 D.P.R. 419, 432 (1986).

En ocasiones anteriores hemos reiterado que en nuestra jurisdicción, el derecho a juicio rápido cobra vigencia tan pronto "el imputado de delito es detenido o está sujeto a responder (held to answer)". Pueblo v. Rivera Santiago, supra; Pueblo v. Miró González, supra; Pueblo v. Rivera Tirado, supra. Véase, también, Pueblo v. Guzmán, 161 D.P.R. 137, 152 (2004). Una persona, natural o jurídica, se considera que está "sujeta a responder" por la comisión de un delito cuando ha sido arrestada o se ha puesto en marcha el mecanismo procesal de forma tal que se encuentre expuesta a ser convicta. Pueblo v. Carrión, 159 D.P.R. 633, 640-641 (2003); Pueblo v. Miró González, supra. En otras palabras, **el derecho a juicio rápido se activa tan pronto "un juez determina causa probable para arrestar, citar o detener a dicho ciudadano"**. Pueblo v. Rivera Santiago, supra, págs. 569-570. Véase, además, Pueblo v. Guzmán, supra.

---

[9] Véanse, además: Pueblo v. Rivera Santiago, 176 D.P.R. 559, 569 (2009); Pueblo v. Guzmán, 161 D.P.R. 137, 152 (2004); Pueblo v. Miró González, 133 D.P.R. 813, 817 (1993); Hernández Pacheco v. Flores Rodríguez, 105 D.P.R 173, 177 (1976).

La Regla 64(n) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 64(n), regula el derecho a juicio rápido. El incumplimiento con los términos allí establecidos conlleva que el acusado pueda solicitar la desestimación de la denuncia o acusación. A esos efectos, y en lo pertinente al caso que nos ocupa, la mencionada regla dispone lo siguiente:

> La moción para desestimar la acusación o la denuncia, o cualquier cargo de las mismas sólo podrá basarse en uno o más de los siguientes fundamentos:
>
> .    .    .    .    .    .    .    .
>
> (n) Que existen una o varias de las siguientes circunstancias, a no ser que **se demuestre justa causa** para la demora o a menos que la demora para someter el caso a juico se deba a la solicitud del acusado o a su consentimiento:
>
> (1)    .    .    .    .    .    .    .    .
>
> (2) **Que no se presentó acusación o denuncia contra el acusado dentro de los sesenta (60) días de su arresto o citación** o dentro de los treinta (30) días si se tratare de un caso en que un magistrado autorizó la radicación de las mismas de conformidad con lo dispuesto en la Regla 6(a). (Énfasis suplido.) Íd.

Al interpretar la citada regla a la luz del derecho a juicio rápido, hemos concluido que el término de 60 días para acusar o denunciar comienza a transcurrir desde que el imputado de delito está "sujeto a responder". Esto es, desde que se determina causa probable para arrestar o citar en virtud de la Regla 6 de Procedimiento Criminal –33 L.P.R.A. Ap. II–, o desde que se arresta a una persona conforme a las Reglas 11 ó 12 de Procedimiento Criminal –33 L.P.R.A. Ap. II–, o desde que se expide una citación

bajo la Regla 7(a) de Procedimiento Criminal -33 L.P.R.A. Ap. II- sujeta a su validación posterior por un juez. D. Nevares-Muñiz, Sumario de Derecho Procesal Penal Puertorriqueño, 8va ed., Puerto Rico, Instituto para el Desarrollo del Derecho, Inc., 2007, pág. 43. Véase, también, E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1993, Vol. III, Sec. 21, pág. 42.

En lo concerniente al efecto de una citación expedida por un agente del orden público sobre los términos dispuestos en la Regla 64(n) de Procedimiento Criminal, *supra*, debemos precisar que dichos plazos comienzan a transcurrir cuando la citación se lleve a cabo a tenor con lo dispuesto en la Regla 7(a) de Procedimiento Criminal, *supra*. La citación oficial autorizada en la mencionada regla es aquella realizada por un agente del orden público contra una persona que ha cometido un delito menos grave y sobre la cual aquél pueda realizar válidamente un arresto sin orden. Regla 7(a) de Procedimiento Criminal, *supra*. En otras palabras, la citación que da inicio al procesamiento penal —y por ende a los términos de juicio rápido- es aquella emitida por un funcionario del orden público como alternativa a un arresto que puede válidamente efectuar sin orden judicial conforme a la Regla 11 de Procedimiento Criminal, 33 L.P.R.A. Ap. II, R. 11. Véase Nevares-Muñiz, op. cit., pág. 59; Chiesa Aponte, op. cit., 1993, Vol. III, Sec. 21, págs. 42-43.

Ahora bien, en ocasiones anteriores este Tribunal ha expresado que la mera inobservancia de los términos de la Regla 64(n) de Procedimiento Criminal, *supra*, no constituye, por sí sola, una violación al derecho a juicio rápido. Pueblo v. Guzmán, supra, pág. 154; Pueblo v. Candelaria, 148 D.P.R. 591, 597-598 (1999). Cónsono con ello, y según se desprende de la Regla 64(n) de Procedimiento Criminal, *supra*, los términos en ella dispuestos pueden ser extendidos ante la existencia de justa causa, o cuando la demora ha sido ocasionada por el propio acusado o con su consentimiento. El peso de probar que existe alguna de las causas antes mencionadas o que el acusado renunció expresa, voluntaria y con pleno conocimiento de su derecho a juicio rápido, recae en el Ministerio Público. Pueblo v. Rivera Santiago, supra, pág. 572; Pueblo v. Guzmán, supra, pág. 156; Pueblo v. Rivera Colón, 119 D.P.R. 315, 323 (1987).

La determinación respecto a la existencia de justa causa para la extensión de los términos de juicio rápido deberá realizarse caso a caso y dentro de los parámetros de razonabilidad. Pueblo v. Guzmán, supra, págs. 154, 156; Pueblo v. Valdés et al., 155 D.P.R. 781, 790-791 (2001). Con el propósito de proveer unas guías para la evaluación de las reclamaciones sobre violación al derecho a juicio rápido, este Foro ha delimitado cuatro criterios que deben ser examinados por el tribunal, a saber: (1) la duración de la tardanza; (2) las razones para la dilación; (3) si

el acusado invocó oportunamente el derecho a juicio rápido; y (4) el perjuicio resultante de la tardanza. Íd. Véase, también, Pueblo v. Rivera Tirado, supra, pág. 433. Ninguno de los mencionados criterios es determinante en la adjudicación del reclamo del acusado; más bien, el valor que se le confiera a cada uno de ellos va a depender de las circunstancias relevantes que el tribunal tiene ante sí. Pueblo v. Valdés et al., supra, pág. 792.

Ahora bien, no podemos perder de perspectiva que en la mayoría de las ocasiones, el factor decisivo para la adjudicación del balance de los criterios recae en la razón para la inobservancia de los términos de juicio rápido.[10] En cuanto a este criterio, debemos hacer una distinción entre la dilación imputable al acusado, aquella provocada por una actuación intencional del Estado y la tardanza ocasionada por una conducta no intencional del Estado.[11] La rigurosidad con la que el tribunal evalúe cada uno de los motivos bajo los cuales se alegue justa causa para la tardanza dependerá de su naturaleza. Así, las actuaciones dilatorias intencionales, cuyo fin sea entorpecer la defensa del imputado, se examinarán con mayor rigurosidad que aquellas no intencionales provocadas por fuerza mayor, negligencia ordinaria de los funcionarios del Estado o por demoras institucionales.

---

[10] Véase E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1992, Vol. II, Sec. 12.1, pág. 143.

[11] Íd., págs. 144-145. Véanse, también: Pueblo v. Valdés et al., 155 D.P.R. 781, 793 (2001); Pueblo v. Rivera Tirado, 117 D.P.R. 419, 435 (1986).

Véanse: Pueblo v. Valdés *et al.*, supra, pág. 793; Chiesa Aponte, op. cit., 1992, Vol. II, Sec. 12.1, págs. 144-145.

En ese contexto, hemos reconocido que la enfermedad de un testigo esencial se considera justa causa para la suspensión de un juicio. Pueblo v. Irlanda, 45 D.P.R. 586, 588-589 (1933); Pueblo v. Ibern, 31 D.P.R. 917, 921 (1923). En esa misma línea de argumentación, el profesor Chiesa Aponte señala que la enfermedad de un juez, en situaciones en las cuales su sustitución no es aconsejable, es una causa que justifica el retraso de un juicio. Chiesa Aponte, op. cit., 1992, Vol. II, Sec. 12.1, pág. 144. Ello se debe a que la enfermedad de un juez, al igual que ocurre con el quebrantamiento de salud de un testigo esencial o de un funcionario público involucrado en el procesamiento criminal, es una causa de fuerza mayor que no puede ser controlada por el Estado. Íd.

El remedio extremo de la desestimación de la denuncia o acusación únicamente debe concederse una vez se haya realizado un análisis ponderado del balance de los criterios esbozados. Pueblo v. Rivera Santiago, supra, págs. 574-575; Pueblo v. Valdés *et al.*, supra, pág. 792. Cónsono con lo anterior, hemos pautado reiteradamente que la mera inobservancia del término no implica, por sí sola, una violación al derecho a juicio rápido. Íd. Por el contrario, la demora en exceso de los términos establecidos en la Regla 64(n) de Procedimiento Criminal, *supra*, acarrea el único efecto de activar o hacer

necesaria la realización del balance de los cuatro criterios mencionados. Íd. Ello es así debido a que "afirmar lo contrario es dar un contenido hermético al concepto de 'juicio rápido' y abstraerlo de las circunstancias variables que le afectan". Pueblo v. Valdés et al., supra, pág. 792.

B

Nuestra Carta de Derechos también garantiza a toda persona la protección contra ataques abusivos a su honra, a su reputación, y a su vida privada y familiar. Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1. En virtud de este mandato constitucional, nuestro ordenamiento penal estatuye como una conducta punible la alteración a la paz de una persona. Así, el Artículo 247 del Código Penal de 2004, supra, -el cual tipifica el delito de alteración a la paz- dispone lo siguiente:

> Incurrirá en delito menos grave toda persona que realice cualquiera de los siguientes actos:
>
> (a) perturbe la paz o tranquilidad de una o varias personas con conducta ofensiva, que afecte el derecho a la intimidad en su hogar, o en cualquier otro lugar donde tenga una expectativa razonable de intimidad;
>
> (b) perturbe la paz o tranquilidad de una o varias personas mediante palabras o expresiones ofensivas o insultantes al proferirlas en un lugar donde quien las oye tiene una expectativa razonable de intimidad, o
>
> (c) perturbe la paz o tranquilidad de una o varias personas mediante vituperios, oprobios, desafíos, provocaciones o palabras insultantes u ofensivas que puedan provocar una reacción violenta o airosa en quien las escucha. 33 L.P.R.A. sec. 4875.

Una lectura del texto antes transcrito refleja que el delito de alteración a la paz tiene tres modalidades. Las primeras dos modalidades -contenidas en los incisos (a) y (b)- tipifican como delito aquella conducta que perturbe la paz a una o varias personas en función del lugar en donde se lleve a cabo la acción punible. Así, las expresiones realizadas por una persona únicamente podrán configurar la modalidad del delito contemplado en los incisos (a) y (b) cuando se realicen en el hogar o en un área en donde exista una expectativa razonable de intimidad. Ello implica necesariamente que la comisión del delito tipificado en los mencionados incisos está condicionada al tiempo, el lugar y la manera de la expresión.

Mientras tanto, el inciso (c) del citado Artículo 247 expone una tercera modalidad que va dirigida a penalizar determinadas expresiones que puedan ocasionar una reacción violenta en la persona que las escucha. En lo particular a las palabras sancionadas, el artículo las limita a aquellas que constituyan vituperios, oprobios, desafíos, provocaciones o palabras insultantes u ofensivas. Al examinar detenidamente esta redacción, resulta evidente que la regulación está relacionada estrictamente al contenido de la expresión. Ello significa que la interpretación y aplicación del inciso (c) debe realizarse dentro del contexto del derecho constitucional a la libertad de expresión.

C

El Artículo II, Sección 4 de la Constitución de Puerto Rico consagra el derecho de todo ciudadano a la libertad de expresión. L.P.R.A., Tomo 1. A esos efectos, la Carta de Derechos proscribe que el Estado apruebe "[l]ey alguna que restrinja la libertad de palabra…". Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1. Dada la importancia que reviste este derecho en una sociedad democrática, hemos reiterado su más celosa protección y su primacía en el campo de los derechos fundamentales. Universidad de Puerto Rico v. Laborde Torres y otros, 2010 T.S.P.R. 225, 180 D.P.R. ___ (2010). Véanse, además: Asoc. de Maestros v. Srio. de Educación, 156 D.P.R. 754, 768 (2002); Coss y U.P.R. v. C.E.E., 137 D.P.R. 877, 886 (1995). Esta primacía, claro está, no implica que el derecho sea irrestricto y que se encuentre inmune a la regulación por parte del Estado cuando la necesidad y conveniencia pública así lo requieran. Universidad de Puerto Rico v. Laborde Torres y otros, supra; Vigoreaux Lorenzana v. Quizno's, 173 D.P.R. 254, 269 (2008); Velázquez Pagán v. A.M.A., 131 D.P.R. 568, 576-577 (1992). En ese sentido, se ha reconocido que el derecho a la libertad de palabra admite la imposición de limitaciones en la medida en que éstas sean interpretadas de forma restrictiva con el fin de que no abarquen más de lo imprescindible. Íd.; Muñiz v. Admor. Deporte Hípico, 156

D.P.R. 18, 24 (2002); Pueblo v. Burgos, 75 D.P.R. 551, 570 (1953).

Al enfrentarnos a una controversia relacionada al derecho a la libre expresión, debemos tener presente que éste tiene su génesis en la Primera Enmienda de la Constitución de Estados Unidos de América. Ésta postula, en lo pertinente, que "[e]l Congreso no aprobará ninguna ley … que coarte la libertad de palabra o de prensa…". Enmd. I, Const. EE.UU., L.P.R.A., Tomo 1. Véase, además, J. Trías Monge, Historia Constitucional de Puerto Rico, Ed. U.P.R., 1982, T. 3, pág. 181. La garantía de libertad de expresión y de prensa antes referida se hizo extensiva a todos los ciudadanos de Estados Unidos, así como a los estados que componen la nación, incluido Puerto Rico. Véanse: Universidad de Puerto Rico v. Laborde Torres y otros, supra; Balzac v. People of Puerto Rico, 258 U.S. 298, 314 (1922). Así, pues, la protección constitucional a la libertad de palabra de nuestra Carta de Derechos debemos interpretarla y hacerla efectiva "no en menor grado de protección" del que le reconoce el Tribunal Supremo de Estados Unidos. Universidad de Puerto Rico v. Laborde Torres y otros, supra; Aponte Martínez v. Lugo, 100 D.P.R. 282, 286-287 (1971); R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416, 427 (1964).

A tono con la anterior norma interpretativa, este Tribunal ha adoptado la doctrina desarrollada por el Tribunal Supremo de Estados Unidos en cuanto a las

facultades y limitaciones del Estado en la regulación del derecho a la libre expresión. Consecuentemente, la casuística local refleja la distinción claramente trazada entre una regulación sobre el tiempo, lugar y manera de la expresión, neutral en su contenido, frente a aquella dirigida a reglamentar su contenido. Véanse: Asoc. de Maestros v. Srio. de Educación, supra, pág. 769; Muñiz v. Admor. Deporte Hípico, supra; Velázquez Pagán v. A.M.A., supra, pág. 577.

En lo atinente al contenido del mensaje, tanto este Tribunal como el Tribunal Supremo federal han permitido su regulación bajo ciertas circunstancias y en ocasiones específicamente limitadas. En ese sentido, hemos permitido la intervención gubernamental sobre expresiones cuyo contenido sea subversivo, difamatorio, obsceno, o que constituya palabras de riña (fighting words), entre otras instancias. Universidad de Puerto Rico v. Laborde Torres y otros, supra; Porto y Siurano v. Bentley P.R., Inc., 132 D.P.R. 331 (1992); Pueblo v. Caro González, 110 D.P.R. 518 (1980); Pueblo v. Burgos, supra.

Ahora bien, en aquellos casos en donde exista duda alguna sobre el poder del Estado para regular determinada expresión por su contenido, la constitucionalidad del estatuto en cuestión puede ser impugnada al amparo de las doctrinas de vaguedad y de amplitud excesiva. U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153, 160 (1993); Velázquez Pagán v. A.M.A., supra. El análisis efectuado bajo ambas

doctrinas va dirigido a examinar la constitucionalidad de la disposición legal concernida de su faz, mas no así en su aplicación. Disidente Univ. de P.R. v. Depto. de Estado, 145 D.P.R. 689, 701 (1998); U.N.T.S. v. Srio. de Salud, supra.[12] Por ello, resulta superfluo evaluar si la aprobación de la ley o del reglamento responde a un interés apremiante del Estado, así como su aplicación a los hechos particulares del caso. Íd.

Si bien es cierto que la vaguedad o amplitud excesiva de una ley o un reglamento acarrea el mismo efecto, esto es, la nulidad del estatuto de su faz, ambas doctrinas se distinguen entre sí. Disidente Univ. de P.R. v. Depto. de Estado, supra; U.N.T.S. v. Srio. de Salud, supra. Por un lado, la norma de vaguedad opera cuando: (1) la disposición legal falla en proveerle a un ciudadano de inteligencia promedio un aviso suficiente de las conductas que proscribe y penaliza; y (2) el estatuto no le provee a los funcionarios encargados de ponerla en vigor unas guías razonables, de forma tal que se preste para una aplicación arbitraria y discriminatoria interfiriendo así con los derechos fundamentales garantizados por la Constitución. Boys and Girls Club v. Srio. de Hacienda, 2010 T.S.P.R. 167, 179 D.P.R. ___ (2010); Pueblo v. APS Healthcare of

---

[12] Véase, también, K. Sullivan & G. Gunther, First Amendment Law, New York, Ed. Foundation Press, 1999, págs. 321-322 ("First, [overbreadth] results in the invalidation of a law "on its face" rather than "as applied" to a particular speaker. […] Overbreadth analysis, in contrast, does not reach the question whether the *challenger's* speech is constitutionally protected; instead it strikes down the statute entirely, because it might be applied to others not before the Court whose activities are constitutionally protected".)

P.R., 175 D.P.R. 368, 378 (2009); Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 239-240 (1988); Vives Vázquez v. Tribunal Superior, 101 D.P.R. 139, 145-146 (1973).

De otra parte, la doctrina de amplitud excesiva entra en función ante una reglamentación cuyo propósito sea castigar o prohibir determinadas expresiones que no estén cobijadas bajo el palio de la Constitución, pero su redacción o interpretación tiene como efecto proscribir expresiones constitucionalmente protegidas por la cláusula de libertad de expresión o asociación. Pueblo v. APS Healthcare of P.R., supra, pág. 375; U.N.T.S. v. Srio. de Salud, supra, pág. 161; Velázquez Pagán v. A.M.A., supra. Su aplicación, tanto en la jurisdicción federal como en la local, se ha limitado a aquellas instancias en las cuales se reclama algún derecho protegido por la cláusula de libertad de expresión o asociación. R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1319. Esto se debe a que el problema que esta doctrina busca atacar es el "[l]lamado efecto neutralizador o 'chilling effect' que suponen leyes que castigan tanto expresión protegida constitucionalmente como aquella no protegida". Pueblo v. APS Healthcare of P.R., supra, pág. 376. Véase, también, Velázquez Pagán v. A.M.A., supra, pág. 578. Asimismo, ayuda a evitar la aplicación selectiva del estatuto, la cual de otra forma quedaría a la discreción de los agentes

del orden público. K. Sullivan & G. Gunther, First Amendment Law, New York, Ed. Foundation Press, 1999, pág. 322 ("An additional reason to contain overbroad statutes, like vague statutes, is to curb "their potential for selective enforcement" at the discretion of law enforcement officials".)

Ahora bien, resulta imperioso reafirmar que para poder invalidar un estatuto de su faz por sobre-extensión, **la amplitud excesiva tiene que ser real y sustancial** en comparación con el alcance legítimo que la medida pueda tener sobre una conducta que no está protegida. Pueblo v. APS Healthcare of P.R., supra, pág. 376; Disidente Univ. de P.R. v. Depto. de Estado, supra, pág. 702; Velázquez Pagán v. A.M.A., supra, págs. 578-579; Pueblo v. Hernández Colón, 118 D.P.R. 891, 899 (1987). Al realizar este examen el decreto de nulidad de su faz de un estatuto por adolecer de amplitud excesiva **debe ser utilizado a manera de excepción y como un último recurso en aquellos casos en donde una interpretación limitada o una invalidación parcial del estatuto no excluyan la amenaza sobre las expresiones constitucionalmente protegidas.**[13] En armonía con esta pauta, el Tribunal Supremo de Estados Unidos ha expresado lo siguiente:

---

[13] Respecto a la posibilidad de superar el problema de la amplitud excesiva de una ley mediante la interpretación restrictiva del estatuto véase: Sullivan & Gunther, op. cit., pág. 322 ("When invalidated for overbreadth, a law is not narrowed, but rather becomes wholly unenforceable until a legislature rewrites it or a properly authorized court construes it more narrowly".)

The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. **Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.** Equally important, overbreadth claims, if entertained at all, have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct. [……]

It remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate. But the plain import of our cases is, at the very least, that **facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct -- even if expressive -- falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.** Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect -- at best a prediction -- cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, **we believe that the overbreadth of a statute must not only be real, but substantial as well,** judged in relation to the statute's plainly legitimate sweep. (Citas omitidas y énfasis suplido). <u>Broadrick v. Oklahoma</u>, 413 U.S. 601 (1973).

D

A tono con lo anterior, el Tribunal Supremo de Estados Unidos elaboró -desde etapas tempranas- una doctrina a los fines de establecer con precisión los límites constitucionales a la sanción penal de palabras o expresiones. En el caso particular de las manifestaciones que pudieran configurar una alteración a la paz susceptible de ser penalizada, dicho Foro las limitó a aquellas expresiones que constituyan palabras de riña o *figthing words*. Chaplinsky v. New Hampshire, 315 U.S. 568 (1942). Estas palabras fueron definidas como las que por el mero hecho de ser proferidas infligen un daño o tienden a causar la inmediata alteración a la paz. Íd.[14] Al evaluar las expresiones de una persona para determinar si constituyen palabras de riña, el tribunal **deberá analizarlas desde la perspectiva de un hombre de inteligencia común y colegir si dichas manifestaciones son susceptibles de causar una reacción violenta inmediata en el receptor de la manifestación**. Gooding v. Wilson, 405 U.S. 518 (1972); Chaplinsky v. New Hampshire, supra.

La referida norma jurisprudencial ha sido reafirmada y aclarada en casos posteriores cuya mayoría ha tenido como resultado la invalidación de leyes estatales debido a su excesiva amplitud al intervenir con expresiones protegidas. Entre ellos podemos mencionar el caso Gooding

---

[14] El criterio de daño fue abandonado posteriormente en Rosenfeld v. New Jersey, 408 U.S. 901 (1972).

v. Wilson, supra, en donde el Tribunal Supremo federal decretó la nulidad de un estatuto del estado de Georgia que penalizaba el uso de lenguaje oprobioso o abusivo que tendiera a ocasionar una alteración a la paz.[15] Este resultado fue sostenido sobre la base de la amplia interpretación conferida al estatuto por el Tribunal Supremo de Georgia.

El Más Alto Foro federal indicó que, luego de estudiar las decisiones de los foros apelativos del estado de Georgia, llegó a la conclusión que la exégesis conferida al estatuto en los casos examinados no limitó la aplicación de la ley a aquellas palabras que tuvieran una tendencia directa a provocar una reacción violenta en el receptor del mensaje, según lo pautó el caso de Chaplinsky v. New Hampshire, supra. A esos efectos, precisó lo siguiente:

> We have [] made our own examination of the Georgia cases, both those cited and others discovered in research. That examination brings us to the conclusion, in agreement with the courts below, that the Georgia appellate decisions have not construed §26-6303 to be limited in application, as in *Chaplinsky*, to words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed". (Énfasis en el original.) Gooding v. Wilson, supra.

En vista de la falla del Tribunal de Apelaciones de Georgia de interpretar el estatuto de forma restrictiva a

---

[15] La disposición legal invalidada, codificada en el *Georgia Code Annotated* §26-6303, establecía lo siguiente: "Any person who shall, without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace ... shall be guilty of a misdemeanor". Gooding v. Wilson, 405 U.S. 518 (1972).

la luz de la doctrina de palabras de riña establecido en Chaplinsky v. New Hampshire, supra, el Tribunal Supremo federal atendió la constitucionalidad de la ley a la luz del significado literal de las palabras *oprobio* y *abusivo*. Las definiciones consideradas por el tribunal fueron las siguientes: (1) *opprobrious*: "conveying or intended to convey disgrace"; (2) *abusive*: "harsh insulting language". Gooding v. Wilson, supra, citando a, Webster's Third New Dictionary (1961). La amplitud de estos términos trajo como consecuencia que los foros apelativos de Georgia penalizaran expresiones que, aun cuando cualificaran dentro de las citadas definiciones, no constituían palabras de riña o *fighting words*. A tenor con dicho análisis, el Tribunal Supremo federal concluyó:

> **Because earlier appellate decisions applied §26-6303 to utterances where there was no likelihood that the person addressed would make an immediate violent response, it is clear that the standard allowing juries to determine guilt "measured by common understanding and practice" does not limit the application of §26-6303 to "fighting" words defined by Chaplinsky.** Rather, that broad standard effectively "licenses the jury to create its own standard in each case". […] Unlike the construction of the New Hampshire statute by the New Hampshire Supreme Court, **the Georgia appellate courts have not construed** §26-6303 "so as to avoid all constitutional difficulties". (Citas omitidas y énfasis suplido.) Gooding v. Wilson, supra.

Posteriormente, en Lewis v. City of New Orleans, 415 U.S. 130 (1974), el Tribunal Supremo de Estados Unidos se enfrentó a un estatuto similar al invalidado en el caso de Gooding v. Wilson, supra, en cuanto a que proscribía el uso de palabras oprobiosas, entre otras, dirigidas a un

miembro de la policía que estuviera en el ejercicio de sus funciones.[16] El referido Tribunal, al momento de examinar la validez del estatuto, utilizó el mismo estándar adoptado en el caso de Gooding v. Wilson, supra; esto es, examinó la interpretación que le confirió el Tribunal Supremo de Luisiana a la disposición legal en controversia.

Según surge de la Opinión emitida por el Tribunal Supremo federal, el decreto de nulidad del estatuto surgió luego que dicho Foro remitiera el caso al Tribunal Supremo de Luisiana con la intención de que esta última corte reconsiderara y limitara su interpretación de la ley impugnada a tenor con lo resuelto en Gooding v. Wilson, supra. No obstante, el tribunal estatal mantuvo sus comentarios sobre la ordenanza en controversia acogiendo las palabras según su significado.

Así las cosas, y en vista que la definición general de *oprobio* incluye palabras que por su mera manifestación no infligen daño o incitan a la inmediata alteración de la paz, el Tribunal Supremo federal concluyó que el estatuto era excesivamente amplio. La interpretación de la ordenanza elaborada por el Tribunal Supremo de Luisiana abría las puertas para que se penalizaran expresiones protegidas por la Primera y Decimocuarta Enmienda. Lewis

---

[16] El estatuto impugnado leía como sigue: "It shall be unlawful and a breach of the peace for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty". Lewis v. City of New Orleans, 415 U.S. 130 (1974).

v. City of New Orleans, supra ("In sum, §49-7 punishes only spoken words.  It can therefore withstand appellant's attack upon its facial constitutionality only if, as authoritatively construed by the Louisiana Supreme Court, it is not susceptible of application to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments".)

E

Según indicamos previamente, el Artículo 247 del Código Penal de 2004, *supra*, tipifica el delito de alteración a la paz.  En lo pertinente al caso que nos ocupa, dicho precepto proscribe que un ciudadano "perturbe la paz o tranquilidad de una o varias personas mediante vituperios, oprobios, desafíos, provocaciones o palabras insultantes u ofensivas que puedan provocar una reacción violenta o airosa en quien las escucha". 33 L.P.R.A. sec. 4875(c).

La modalidad del delito de alteración a la paz tipificada en el citado inciso (c) del Artículo 247, *supra*, es similar a aquella sancionada en el pasado Artículo 260(a) del Código Penal de 1974.[17]  A tenor con este último artículo, el delito de alteración a la paz quedaba configurado cuando una persona "perturbare la paz

---

[17] El Artículo 260 del Código Penal de 1974 fue reformulado y así numerado como el Artículo 247 del Código Penal de 2004.  33 L.P.R.A. sec. 4875.  Éste es producto del desarrollo jurisprudencial en torno al Artículo 260 de 1974, por lo que su contenido "pretende armonizar el derecho a la libertad de expresión … con el derecho que tiene todo ciudadano a la protección de su vida privada o familiar de ataques abusivos a su honra, su reputación, integridad y a su intimidad". D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, 3ra ed., Puerto Rico, Instituto para el Desarrollo del Derecho, Inc., 2008, pág. 323.

o tranquilidad de algún individuo o vecindario, con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones".[18]

Una lectura comparada del Artículo 247(c) del Código Penal de 2004, *supra*, y del Artículo 260 del Código Penal de 1974, *supra*, demuestra que la modalidad del delito penalizada en ambos preceptos legales es aquella en donde la conducta del ofensor perturba la tranquilidad y paz de la víctima como resultado de las palabras proferidas.[19] Consecuentemente, la doctrina desarrollada por este Foro en cuanto a la extensión y aplicación del delito de alteración a la paz en su modalidad de conducta desafiante, ofensiva y provocativa mantiene su vigencia en la medida que esté en armonía con los límites constitucionales establecidos.

---

[18] Véanse: Pueblo v. Irizarry, 156 D.P.R. 780, 799 (2002); Pueblo v. Rodríguez Lugo, 156 D.P.R. 42, 49-50 (2002).

[19] En Pueblo v. Irizarry, supra, el Juez Asociado Efraín Rivera Pérez se expresó en cuanto a la conducta proscrita en el inciso (a) del Artículo 260 del Código Penal de 1974. En lo pertinente, el Juez Rivera Pérez señaló lo siguiente:

> "La modalidad de alteración a la paz antes indicada consiste en perturbar la paz o tranquilidad de un individuo a base de gritos fuertes e inusitados, conducta tumultuosa u **ofensiva**, amenazas, **vituperios**, riñas, **desafíos** o **provocaciones**". (Énfasis en el original omitido y negrillas suplidas.) Íd. (Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez, pág. 806.)

En ese mismo contexto, la profesora Dora Nevares-Muñiz explica que la modalidad del delito de alteración a la paz tipificada en el inciso (c) del Artículo 247 del Código Penal de 2004 es aquella que

> "[p]erturba la paz o la tranquilidad de una o varias personas mediante **vituperios**, oprobios, **desafío**, **provocación** o palabras insultantes u **ofensivas** que puedan provocar una reacción violenta o airada en quien las escucha". (Énfasis suplido). Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit., pág. 324.

Al interpretar el delito de alteración a la paz, particularmente el tipo que se configura mediante palabras o expresiones, hemos reconocido la necesidad imperiosa de atemperar su contenido y marco de aplicación a las normas desarrolladas en el contexto del derecho a la libre expresión. En ese sentido, la exégesis adoptada tiene que ser cuidadosamente demarcada para penalizar únicamente aquella expresión o palabra que no esté protegida por la cláusula constitucional a la libre expresión, excluyendo así la posibilidad de una aplicación extralimitada sobre manifestaciones constitucionalmente protegidas. Gooding v. Wilson, supra.[20] Con ello en mente, y en aras de atemperar el delito a los principios doctrinales elaborados en torno al derecho a la libre expresión, resolvimos que la conducta sancionada en el delito de alteración a la paz era aquella que constituyera palabras de riña (*fighting words*). Pueblo v. Rodríguez Lugo, 156 D.P.R. 42, 49-50 (2002); Pueblo v. Caro González, 110 D.P.R. 518, 525 (1980). Véanse, además: Gooding v. Wilson, supra; Chaplinsky v. New Hampshire, supra.

Las palabras de riña han sido definidas como aquellas expresiones que son capaces de causar una reacción violenta inmediata en el receptor de la expresión. Chaplinsky v. New Hampshire, supra. Véase, además, Pueblo v. Rodríguez Lugo, supra, pág. 50. El estándar al amparo

---

[20] "The statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression". Gooding v. Wilson, supra.

del cual se debe evaluar la naturaleza de la expresión para determinar si las palabras se consideran o no de riña es el de una persona de inteligencia común. Así, bajo este estándar se considerarán palabras de riña aquellas expresiones que sean tan ofensivas que por el mero hecho de ser proferidas, tiendan a causar que una persona de inteligencia común o de sensibilidad ordinaria reaccione violentamente. Véase Pueblo v. Rodríguez Lugo, supra, pág. 50.

En síntesis, para que se configure el acto delictivo penalizado en el inciso (c) del Artículo 247, *supra*, es necesario que concurran dos elementos indispensables; a saber, un elemento objetivo y uno subjetivo. El elemento objetivo consiste en determinar si el lenguaje utilizado constituye palabras de riña capaz de ocasionar una reacción violenta inmediata en una persona de sensibilidad ordinaria. Para ello debemos evaluar el contexto y circunstancias en las cuales se realizó la expresión.[21] Cabe destacar que para que se entienda presente este elemento objetivo, no es necesario que la víctima del delito, en efecto, haya respondido al acto o manifestación con violencia.[22] No obstante, es imperioso que las manifestaciones hayan sido dirigidas a la persona que las escucha. Cohen v. California, 403 U.S. 15 (1971).

---

[21] Véase Pueblo v. Irizarry, supra, (Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez, pág. 808.)

[22] Íd., pág. 807.

Por su parte, el elemento subjetivo consiste en determinar si la paz de la alegada víctima fue, en efecto, perturbada. Pueblo v. Irizarry, supra, págs. 799-800. La configuración de este elemento presupone que la persona a quien iba dirigida la expresión se encontraba en paz previo a la actuación del imputado. Pueblo v. De León Martínez, supra. Así, el estado anímico de la supuesta víctima antes del incidente debe ser objeto de prueba, toda vez que si la persona no estaba en un estado de paz y tranquilidad previo al momento de la manifestación, no existe paz alguna que pueda alterarse. Además, para que se entienda alterada la paz de una persona, **no basta que ésta sienta un mero malestar con las palabras proferidas en su contra**, sino que la expresión tiene que ser capaz de provocar en la víctima una respuesta violenta inmediata. Íd.

F

Ahora bien, cuando nos enfrentamos a un caso en donde la alegada víctima del delito es un policía, el estándar para evaluar si la expresión proferida es susceptible de configurar el delito de alteración a la paz tipificado en el inciso (c) del Artículo 247 es más estricto. Esto se debe en parte al entrenamiento que reciben los policías para ejercitar un mayor grado de autorrestricción como parte de su función de preservar el orden. Pueblo v. Caro

González, supra, pág. 529.[23] Asimismo, el Tribunal Supremo federal ha sostenido esta norma basándose en la Primera Enmienda de la Constitución de Estados Unidos, la cual le otorga una protección significativa a la crítica y al cuestionamiento verbal dirigidos a los agentes de la policía. <u>Houston v. Hill</u>, 482 U.S. 451 (1987).[24]

Lo anterior, claro está, no significa que la aplicación del delito de alteración a la paz, en la modalidad tipificada en el inciso (c) del Artículo 247, *supra*, no pueda ser aplicada cuando la alegada víctima sea un policía. Por el contrario, en otras ocasiones hemos reconocido, y así lo reafirmamos, que el Cuerpo de la Policía se compone de individuos cuya honra y reputación están igualmente protegidas por los principios constitucionales que promulgan la dignidad del ser humano. <u>Pueblo v. Caro González</u>, supra, pág. 528. Ciertamente, "al asumir tan importante función no renuncian a ese

---

[23] En <u>Houston v. Hill</u>, 482 U.S. 451 (1987), el Tribunal Supremo de Estados Unidos resolvió, en cuanto a la doctrina de palabras de riña, lo siguiente:

> "[the fighting words doctrine] might require a narrower application in cases involving words addressed to a police officer, because **'a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen**, and thus be less likely to respond belligerently to 'fighting words''". (Énfasis suplido.) Citando a: <u>Lewis v. City of New Orleans</u>, 415 U.S. 130 (1974) (Opinión Concurrente del Juez Powell).

[24] El Tribunal Supremo de Estados Unidos se expresó como sigue:

> "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. 'Speech is often provocative and challenging....But it is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above inconvenience, annoyance, or unrest'". (Citas omitidas.)

intangible -pero real- elemento de honra que todos albergamos en nuestro espíritu". Íd.

No obstante, al evaluar el elemento objetivo del delito -esto es, el contenido, contexto y las circunstancias bajo las cuales se realizó la expresión-, "siempre ha de atenderse al hecho de que en la relación de un policía debe esperarse un mayor grado de control de sus emociones, **demostrando un alto grado de tolerancia ante las posibles afrentas de que pueda ser objeto en fluidas situaciones**". (Énfasis suplido.) Pueblo v. Caro González, supra, pág. 529.

Aun cuando este Foro ha tenido amplia oportunidad para delimitar la aplicación del delito de alteración a la paz, en pocas ocasiones nos hemos enfrentado a una situación en donde la víctima del delito sea un agente de la policía. La primera vez en que se nos planteó esta controversia particular fue en Pueblo v. Kortright, 70 D.P.R. 399 (1949). Allí el joven Luis Kortright, mientras participaba en una manifestación en la Universidad de Puerto Rico, expresó "en un tono alto" y de forma "algo violent[a]" que "esos policías y esta detective son unos abusadores y unos **charlatanes**". (Énfasis suplido.) Íd., pág. 400. Este tribunal resolvió que esa prueba no era suficiente para demostrar la configuración del delito de alteración a la paz. Especificamos que "el pronunciar las palabras atribuidas al acusado 'en un tono alto, que lo oímos, un poco excitado, algo violento,' no es suficiente

bajo todas las circunstancias de este caso para que el delito de alterar la paz se considere cometido". Íd., pág. 401.

Posteriormente, en <u>Pueblo v. Caro González</u>, supra, discutimos de forma un poco más abarcadora el delito de alteración a la paz y pautamos -sutilmente- la norma aplicable en los casos en donde la persona afectada fuese un policía. Los hechos que originaron la denuncia ocurrieron cuando dos agentes de la policía acudieron a la residencia del señor Caro González en respuesta a una querella presentada por la esposa de este último. Una vez se personaron al lugar, los agentes intentaron comunicarse con el señor Caro González, pero éste no les respondió. Cuando el acusado se dio cuenta de la presencia de los policías, agarró el palo de una escoba y, mientras daba golpes con el objeto, dijo: "La policía que se vaya al c...jo, ustedes son unos p....jos. Suban arriba, que les voy a entrar a palos". Íd., pág. 520.

Luego de examinar las circunstancias particulares del caso, concluimos que las expresiones proferidas por el señor Caro González constituyeron una alteración a la paz de los policías involucrados. Así, señalamos que el significado atribuido por la idiosincrasia general del pueblo a las palabras manifestadas por el acusado resultaban, por su propia naturaleza, ofensivas, hirientes e irritantes; y, más que generar cierta molestia en los agentes, **eran capaces de provocar una reacción violenta o**

**de riña inmediata.** Pueblo v. Caro González, supra, págs. 530-531.

Luego, en Pueblo v. Ortiz Díaz, 123 D.P.R. 865 (1989) (Sentencia con Voto de Conformidad emitido por el Juez Asociado señor Alonso Alonso), revocamos una sentencia emitida por el foro de primera instancia en donde declaró culpable al Sr. Reinaldo Ortiz Díaz por el delito de alteración a la paz, entre otros. La prueba sometida apuntaba a que el señor Ortiz Díaz intervino a favor de una joven que estaba siendo detenida por un policía. En particular, alegaron que el acusado le interpeló al policía sobre la existencia de una orden de arresto para poder realizar la detención. El agente, por su parte, le respondió que la muchacha había cometido un delito y que si continuaba preguntando por la orden de arresto, también lo detendría. Acto seguido, el señor Ortiz Díaz "le gritó [al policía] **charlatán**, hijo de la g...n p...a y c...n". (Énfasis suplido.) Íd., pág. 867.

La prueba sometida por la defensa en este caso evidenció que la actitud del agente hacia la joven arrestada y el acusado fue agresiva. A esos efectos, precisamos que ante el requerimiento del señor Ortiz Díaz para que le mostrara una orden de arresto, el policía le contestó con palabras ofensivas y le indicó que "él era la ley y que la ley se metía donde quería". Pueblo v. Ortiz Díaz, supra, pág. 875. Ante esta conducta provocativa por parte del agente de la policía, concluimos que el señor

Ortiz Díaz no incurrió en el delito de alteración a la paz.

Nuestro análisis y *ratio decidendi* en los casos antes citados son cónsonos con la doctrina desarrollada en la jurisdicción federal sobre este asunto, la cual —a su vez— ha sido adoptada y aplicada por varios circuitos del Tribunal de Apelaciones Federal.[25] A manera de ejemplo, podemos mencionar el caso United States v. Poocha, 259 F.3d 1077 (9th Cir. 2001).[26] Los hechos que dieron origen a la querella en contra del Sr. Nolan Poocha ocurrieron durante el arresto de un individuo en un parque nacional. Durante la intervención de la policía, uno de los agentes se acercó a un grupo de ciudadanos que observaban, de forma molesta y hostil, el arresto. Dentro de ese grupo se encontraba el señor Poocha, quien le respondió al agente "*fuck you*" al éste pedirle que se retirara del lugar. Asimismo, el acusado alegadamente apretó los puños y sacó su pecho mientras hacía esas expresiones ("Poocha

---

[25] Véanse, Johnson v. Campbell, 332 F.3d 199 (3rd Cir. 2003) (el acusado llamó al policía "*son of a bitch*" mientras éste último le hacía ciertas preguntas sobre su identidad a los fines de determinar si era la persona sobre la cual un ciudadano se había querellado. El Tribunal concluyó que el delito no se había cometido.); McDermott v. Royal, 213 Fed. Appx. 500 (8th Cir. 2007) (el Tribunal revocó la convicción fundamentado en que el hecho de agitar las manos y gritarle blasfemias a los policías no constituían palabras con riña, particularmente cuando el acusado se mantuvo alejado de ellos y nunca intentó acercárseles); Stearns v. Clarkson, 615 F.3d 1278 (10th Cir. 2010) (las expresiones "*you´re probably the mother f**** that shot my dad*" proferidas por un ciudadano en contra de un policía no constituyeron causa probable para arrestar al primero por alteración a la paz. Las circunstancias presentes en ese caso no eran suficientes para convertir esas manifestaciones en una amenaza contra el agente).

[26] La apelación atendida en este caso provino del Tribunal Federal para el Distrito Este de California. Cabe mencionar que el delito de alteración a la paz tipificado en el Artículo 260 del Código Penal de 1974 se adoptó del Código Penal de 1902 de California. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit., pág. 321.

'clenched his fists, stuck out his chest, and yelled 'fuck you'"). Íd.

El Tribunal de Apelaciones de Estados Unidos para el Noveno Circuito resolvió que las expresiones del señor Poocha no configuraron el delito de alteración a la paz. Al disponer de la controversia, el tribunal aclaró que **la crítica a la policía no es un delito por sí solo.** Agregó que el hecho de que la expresión esté acompañada por gestos agresivos no priva al ciudadano de su protección constitucional a la libertad de expresión y a criticar la conducta de los agentes del orden público. Citando al Tribunal Supremo federal en el caso Houston v. Hill, supra, la corte apelativa concluyó lo siguiente: "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest **is one of the principal characteristics by which we distinguish a free nation from a police state**". (Énfasis suplido.) United States v. Poocha, supra.

III

En esta ocasión, el primer señalamiento de error va dirigido a impugnar la negativa del tribunal a desestimar las denuncias por haber sido supuestamente presentadas en contravención a la Regla 64(n)(2) de Procedimiento Criminal, supra. En particular, el peticionario alega que el Estado no demostró justa causa para haberse demorado más de 60 días en presentar las denuncias, contados desde la fecha de la citación expedida por el sargento Pagán

Matos el día de los hechos. Añade que la falta de justificación para la dilación implicaba que las denuncias tenían que ser desestimadas al amparo de la Regla 64(n)(2). No le asiste la razón.

Según se desprende del expediente, la citación expedida el 15 de noviembre de 2006 por el sargento Pagán Matos en contra del peticionario se llevó a cabo en virtud de la Regla 7(a) de Procedimiento Criminal, *supra*. Esto es, la citación se realizó como alternativa a un arresto por la comisión de un delito menos grave. Así, la citación en cuestión implicó que el peticionario quedó sujeto a responder por la comisión de un delito, lo que a su vez dio inicio a los términos de juicio rápido dispuestos en la Regla 64(n), incluido el plazo de 60 días para la presentación de la denuncia.[27]

A tenor con lo anterior, el Estado tenía hasta el 14 de enero de 2007 para presentar las denuncias en contra del peticionario. Sin embargo, éstas fueron sometidas en mayo de 2007, cuatro meses después de expirado el plazo de 60 días concedido en la Regla 64(n)(2) de Procedimiento Criminal, *supra*.[28] Si bien es cierto que la actuación del Estado no se circunscribió a los términos de juicio rápido

---

[27] Véanse, D. Nevares-Muñiz, <u>Sumario de Derecho Procesal Penal Puertorriqueño</u>, 8va ed., Puerto Rico, Instituto para el Desarrollo del Derecho, Inc., 2007, pág. 43; Chiesa Aponte, <u>op. cit.</u>, 1993, Vol. III, Sec. 21, pág. 42.

[28] Sobre este aspecto, la Opinión Disidente emitida por nuestro compañero Juez Presidente señor Hernández Denton erróneamente enfatiza que la dilación fue de seis meses. Este cálculo es incorrecto, pues incluye el término de 60 días que el Ministerio Público dispone para presentar la denuncia. **Es luego de transcurridos los 60 días antes descritos que la dilación, si alguna, comienza a decursar.**

dispuestos en las reglas procesales, entendemos que el Ministerio Público demostró la existencia de justa causa para tal dilación.

Durante la vista evidenciaria celebrada previo al inicio del juicio para discutir la moción de desestimación presentada por el peticionario, el Ministerio Público presentó el testimonio del sargento Pagán Matos. A través de su declaración el sargento acreditó -y la defensa así lo estipuló- que el 28 de noviembre de 2006, tanto él como el peticionario acudieron al Tribunal de Primera Instancia en cumplimiento con la citación expedida el día de los hechos. A pesar de ello, en esa fecha no pudieron someter el caso debido a la falta de secretarias en el cuartel de la policía para procesar las denuncias. En ese momento, según surge del testimonio vertido en la audiencia, el sargento intentó fijar una fecha para comparecer al tribunal, pero el abogado del peticionario indicó que tenía señalamientos previos en otra sala. El sargento también manifestó que después de la primera citación hizo varias llamadas a la oficina del abogado del peticionario con el fin de concertar una nueva fecha para someter el caso, pero sus esfuerzos resultaron infructuosos.

Asimismo, el sargento Pagán Matos testificó que estuvo dos meses ausente de su empleo debido a una condición de salud que requirió una intervención quirúrgica. Una vez se reintegró a sus labores, alrededor de marzo de 2007, intentó nuevamente acordar una fecha con

la defensa, pero volvió a recibir como respuesta que su calendario estaba lleno.

Luego de escuchado el testimonio y el correspondiente contrainterrogatorio efectuado por la defensa del peticionario, el foro sentenciador le confirió credibilidad a la declaración del sargento. Así, el tribunal concluyó que existió justa causa para la dilación en la presentación de las denuncias. Consecuentemente, denegó la solicitud de desestimación presentada por el peticionario.

En reiteradas ocasiones este Tribunal ha sostenido que las determinaciones de hechos del foro primario sustentadas en prueba oral, merecen gran deferencia por los tribunales apelativos. Esto se debe a que es "el juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manierismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". (Citas omitidas.) Argüello v. Argüello, 155 D.P.R. 62 (2001); Figueroa v. Am. Railroad Co., 64 D.P.R. 335 (1994). En ese sentido, el foro primario se encuentra en mejor posición para evaluar y adjudicar la credibilidad de un testigo. Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799, 810 (2009); Trinidad v. Chade, 153 D.P.R. 280 (2001); Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721 (1984).

En armonía con nuestras expresiones, hemos resuelto que los foros apelativos deberán abstenerse de intervenir con las determinaciones de hechos y la adjudicación de credibilidad realizada por el tribunal de instancia, excepto cuando concluya que este último ha incurrido en pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. S.L.G. Rivera Carrasquillo v. A.A.A., 177 D.P.R. 345, 356 (2009); Ramírez Ferrer v. Conagra Foods PR, supra, pág. 811; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991); Ortiz v. Cruz Pabón, 103 D.P.R. 939 (1975).

Luego de examinar detenidamente el expediente, así como la transcripción de la prueba oral que obra en autos, no encontramos indicio alguno de pasión, prejuicio, parcialidad, o error manifiesto en la apreciación de la prueba por parte del Tribunal de Primera Instancia. En consecuencia, procede concederle deferencia a la adjudicación de credibilidad conferida por el foro primario al testimonio del sargento Pagán Matos y reconocer la existencia de justa causa para la demora en la presentación de las denuncias.

En lo atinente a la existencia de justa causa, la transcripción de la prueba oral, particularmente el testimonio del sargento Pagán Matos, habla por sí sola. La prueba refleja que el sargento Pagán Matos realizó gestiones afirmativas para concretar una fecha en la cual pudiera presentar las denuncias, pero sus esfuerzos

resultaron infructuosos debido -en mayor parte- a la renuencia mostrada por el abogado del peticionario. En ese sentido, debemos resaltar que el día señalado en la citación original, el sargento y el peticionario acudieron al tribunal oportunamente para presentar las denuncias. Si bien es cierto que las denuncias no pudieron ser tramitadas debido a la falla del Estado en tenerlas preparadas, no es menos cierto que en el mismo tribunal el sargento Pagán Matos realizó acercamientos con el abogado del peticionario con el propósito de acordar una nueva fecha para someter el caso. El referido acuerdo, sin embargo, no pudo ser concretado por razones atribuibles al abogado de la defensa -en ese momento y en las llamadas posteriores efectuadas por el sargento- bajo el pretexto de que tenía señalamientos previos en otra sala.[29]

Ese mismo patrón de respuesta fue nuevamente adoptado por el abogado de la defensa cuando el sargento Pagán Matos se comunicó con él luego de reincorporarse a sus funciones en la Policía tras una intervención quirúrgica a la que fue sometido. Entendemos que esta actuación reiterada de la defensa en eludir la concretización de una fecha para presentar las denuncias, fue la razón principal de la dilación en el procesamiento criminal de autos.

---

[29] La Opinión Disidente y Concurrente emitida por el compañero Juez Presidente señor Hernández Denton omite esta parte medular del testimonio del sargento Pagán Matos en donde se evidencian sus gestiones afirmativas para coordinar una fecha alterna con el abogado del peticionario para someter las denuncias en contra del señor García Colón.

Incluso, la enfermedad del sargento Pagán Matos también constituye justa causa para la tardanza en la presentación de las denuncias. Anteriormente señalamos que la enfermedad de un testigo esencial ha sido aceptada como una justificación razonable para suspender un juicio y extender los términos de juicio rápido.[30] Ciertamente, el reconocimiento de justa causa para la dilación fundamentado en una condición de salud, debe ser debidamente sustentado y probado ante el tribunal sentenciador, ya sea mediante evidencia testifical o documental. Ahora bien, una vez la existencia de la condición de salud bajo la cual se alega justa causa queda probada, nos reafirmamos en que el tribunal podrá reconocer la enfermedad como una justificación para la dilación luego de haber sopesado todos los criterios que debe considerar para adjudicar el asunto.

En el presente caso, la persona cuya condición de salud retrasó la presentación de las denuncias fue la del sargento Pagán Matos. Este funcionario era la persona idónea para presentar las denuncias por tener conocimiento personal de los hechos y ser el supervisor inmediato de los agentes involucrados en el caso.[31] Ante tales

---

[30] Véanse: Pueblo v. Irlanda, 45 D.P.R. 586, 588-589 (1933); Pueblo v. Ibern, 31 D.P.R. 917, 921 (1923); Chiesa Aponte, op. cit., 1992, Vol. II, Sec. 12.1, pág. 144.

[31] Como es sabido, cuando un agente de la Policía o un miembro de su unidad familiar es víctima de delito, ese agente no debe completar un reporte de incidente, iniciar una investigación o un procedimiento al amparo de la Regla 6 de Procedimiento Criminal, 33 L.P.R.A. Ap. II, R.6, sobre ese delito en particular. De lo contrario, sus acciones constituirían un claro conflicto de interés, el cual está prohibido por la Ley Núm. 12 de 24 de julio de 1985, según enmendada, conocida

circunstancias, la dilación ocasionada por la enfermedad del sargento Pagán Matos -la cual requirió una intervención quirúrgica y lo mantuvo fuera de sus labores por un período de dos meses- constituye una justificación válida y razonable para extender los términos de juicio rápido.[32]

Por otro lado, también debemos destacar que el peticionario no presentó prueba respecto al perjuicio que la tardanza le ocasionó, el cual constituye uno de los cuatro criterios que el tribunal debe sopesar para determinar si hubo o no justa causa en la dilación. Este Tribunal ha reiterado que **el acusado tiene el peso de probar que ha sufrido algún perjuicio con la tardanza en el procesamiento criminal.**[33]   A esos efectos, hemos

---

como Ley de Ética Gubernamental, y por el Reglamento Núm. 4216 del 11 de mayo de 1990, según enmendado, conocido como Reglamento de Personal de la Policía de Puerto Rico. **Consecuentemente, es necesario que el agente víctima de delito refiera el asunto a su supervisor u otro miembro de la Policía que no tenga conflicto.**

[32] En esta ocasión, la disidencia pasa por alto un hecho relevante como lo es la condición de salud o enfermedad que acreditó ante el foro primario el sargento Pagán Matos.   Sopesar livianamente esta circunstancia y no reconocer que la misma constituye justa causa para la demora en la presentación de las denuncias, es contrario al criterio de razonabilidad que reiteradamente hemos apuntalado ante un reclamo de violación al derecho a juicio rápido. Véanse: Pueblo v. Rivera Santiago, supra; Pueblo v. Valdés *et al.*, supra.

[33] Advertimos que en la Opinión Concurrente y Disidente emitida por el Juez Presidente señor Hernández Denton, se hace referencia al perjuicio que el señor García Colón alegadamente sufrió a causa de la tardanza en la presentación de las denuncias.   Al respecto, el distinguido compañero señala lo siguiente: "Asimismo, el señor García Colón invocó oportunamente su derecho a juicio rápido y hubo un perjuicio resultante de la referida tardanza".   Opinión Concurrente y Disidente, *supra*, págs. 5-6.

Una lectura concienzuda y pormenorizada de la transcripción de la vista evidenciaria sobre la desestimación de las denuncias, así como del expediente, no refleja que el peticionario haya acreditado fehacientemente que la dilación le ocasionó un perjuicio por los cargos sometidos en su contra.   El tribunal no puede llegar a esas conjeturas y tomarlo como un hecho cierto sin que la parte obligada a presentar prueba al respecto así lo sostenga con evidencia concreta.

enfatizado que el perjuicio sufrido por el acusado "no puede ser abstracto ni apelar a un simple cómputo de rigor matemático", sino que éste "tiene que ser real y sustancial".[34]

A tenor con esta discusión, concluimos que el tribunal de instancia no abusó de su discreción al denegar la desestimación de las denuncias por violación a la Regla 64 (n)(2) de Procedimiento Criminal, *supra*. En el balance de criterios, la enfermedad sobrevenida al sargento Pagán Matos y la intransigencia del abogado de la defensa en acordar una fecha alterna para someter las denuncias en contra del peticionario, constituyen justa causa dentro del criterio de razonabilidad que debe imperar en esa determinación.[35]

En esta coyuntura debemos enfatizar el repudio y desaprobación de este Foro al empleo de tácticas dilatorias, que en ocasiones son utilizadas durante el

---

[34] Pueblo v. Rivera Santiago, supra; Pueblo v. Valdés *et al.*, supra, pág. 792, citando a Chiesa Aponte, op. cit., 1992, Vol. II, Sec. 12.1, pág. 153; Pueblo v. Rivera Tirado, supra, pág. 438.

[35] Sobre este aspecto debemos enfatizar, además, que el sargento Pagán Matos actuó conforme a nuestros pronunciamientos en Pueblo v. Rivera Martell, 173 D.P.R. 601, 615-616 (2008), al no optar por presentar la denuncia en ausencia del imputado. Precisamente, por voz del Juez Presidente señor Hernández Denton, expresamos:

> "En el contexto de la Regla 6, precisamente, el legislador incorporó unas garantías a favor de los imputados de delito en la etapa de determinación de causa probable para arresto. Evidentemente, para poder ejercer esas garantías estatutarias los imputados, de ordinario, deben estar presentes. Para esto se requiere, sin duda, que se les cite a la vista de determinación de causa probable para arresto. Tal requisito es el mecanismo para darle vigencia a los derechos conferidos en el tercer párrafo de la Regla 6(a), *supra*, y constituye una consecuencia razonable de la norma que nos requiere suplir las lagunas que surgen de la ley e interpretarla de forma tal que guarde armonía y lógica interna." Íd.

procesamiento criminal, con el fin de invocar posteriormente el derecho a juicio rápido. La utilización de subterfugios para retrasar los procedimientos, similares a los empleados en el presente caso por el abogado del peticionario, son -en la mayoría de los casos- los verdaderos escollos que inciden en el buen funcionamiento del sistema de justicia y en la pronta adjudicación de las causas criminales.

IV

Por otro lado, el peticionario aduce que el Artículo 247, inciso (c), del Código Penal de 2004, *supra*, es inconstitucional por adolecer de amplitud excesiva. Si bien es cierto que en ocasiones anteriores hemos interpretado el delito de alteración a la paz y delimitado su aplicación en cuanto a la modalidad dirigida a penalizar cierto tipo de expresiones, todos estos pronunciamientos han girado en torno al texto incluido en el Artículo 260 del Código Penal de 1974, *supra*. Según indicamos anteriormente, la redacción del nuevo Artículo 247 del Código Penal de 2004, *supra*, varió en comparación con el Artículo 260 del Código Penal de 1974, *supra*. Ante estas circunstancias, nos corresponde examinar con detenimiento la constitucionalidad del delito de alteración a la paz según codificado en el Artículo 247(c) del Código Penal de 2004, *supra*. Adelantamos que no coincidimos con el planteamiento de inconstitucionalidad presentado por el peticionario.

El inciso (c) del Artículo 247 del Código Penal, *supra*, proscribe que una persona le altere la paz a uno o varios individuos mediante el uso de "vituperios, oprobios, desafíos, provocaciones o palabras insultantes u ofensivas que puedan provocar una reacción violenta o airosa en quien las escucha". Un estudio detenido y ponderado de este inciso nos lleva a deducir que la conducta penalizada está estrechamente atada al contenido de la expresión. Así, la constitucionalidad del Artículo 247(c), *supra*, deberá ser evaluada a la luz de la doctrina de amplitud excesiva. En particular, nos corresponde examinar si las expresiones prohibidas -vituperios, oprobios, desafíos, provocaciones, o palabras insultantes u ofensivas- se encuentran excluidas de la protección constitucional a la libertad de palabra o si, por el contrario, la regulación se sobre-extendió para incluir expresiones que están constitucionalmente protegidas. Veamos.

Según expusimos, el Tribunal Supremo de Estados Unidos ha desarrollado una doctrina precisa sobre la regulación de expresiones protegidas bajo la Primera Enmienda de la Constitución federal. Esta protección se hizo extensiva a todos los estados y territorios, incluso Puerto Rico. Por tal motivo, cuando este Tribunal se enfrenta a la tarea de interpretar la validez constitucional de un estatuto que regula palabras o expresiones, estamos intimados a adoptar las normas

pautadas en la jurisdicción federal en cuanto a la protección mínima reconocida al derecho a la libre expresión. Este ejercicio se hace teniendo en mente, claro está, que las decisiones del Más Alto Foro federal son vinculantes para este Tribunal en cuanto al mínimo de protección reconocido, permitiéndonos así conferirle mayor resguardo al referido derecho al amparo de nuestra Constitución, la cual es de "factura más ancha". Pueblo v. Díaz, Bonano, 176 D.P.R. 601, 621 (2009); Pueblo v. Martínez Acosta, 174 D.P.R. 275, 289-290 (2008); Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 D.P.R. 924, 948 (2000); López Vives v. Policía de P.R., 118 D.P.R. 219, 226-227 (1987).

Un estudio de la jurisprudencia federal refleja que la regulación de expresiones por parte del Estado a través de leyes que penalizan la alteración a la paz o conducta desordenada, ha sido limitada a aquellas palabras que sean de riña (*fighting words*). Así, el Tribunal Supremo de Estados Unidos ha decretado la nulidad de su faz de estatutos que tipifican el delito de la alteración a la paz o proscriben la conducta desordenada debido a que su redacción y la interpretación conferida por el foro estatal no limitan su aplicación a las palabras de riña. Véanse: Lewis v. City of New Orleans, supra; Gooding v. Wilson, supra.

En nuestra jurisdicción adoptamos la doctrina pautada sobre palabras de riña al interpretar y delimitar la

aplicación del delito de alteración a la paz codificado en el Artículo 260(a) del Código Penal de 1974, *supra*. Véanse, Pueblo v. Rodríguez Lugo, supra; Pueblo v. Caro González, supra. Atemperándose a este trasfondo jurisprudencial, así como a la casuística federal interpretativa de la Primera Enmienda, la redacción del delito de alteración a la paz en su modalidad de penalizar ciertas expresiones fue reformulada en el Artículo 247(c) del Código Penal de 2004, *supra*.[36]

Una lectura ponderada del nuevo Artículo 247, inciso (c), *supra*, claramente evidencia la adopción de un lenguaje más restrictivo cónsono con la norma jurisprudencial desarrollada en torno al derecho a la libre expresión. Contrario al texto del Artículo 260(a) del Código Penal de 1974, *supra*, el inciso (c) del Artículo 247 de 2004 limita expresamente la facultad del Estado para imponer sanciones por determinadas expresiones a aquellas instancias en las cuales las palabras proferidas **"puedan provocar una reacción violenta o airada en quien las escucha"**. Artículo 247(c), Código Penal de 2004, *supra*. Esta redacción refleja de forma inequívoca el propósito y la intención de penalizar únicamente aquel lenguaje que propenda a una persona a reaccionar de forma violenta; esto es, palabras de riña.

---

[36] Respecto al trasfondo del delito de alteración a la paz codificado en el Código Penal de 2004, véase: D. Nevares-Muñiz, Estudios comparados de Códigos Penales: informes parte especial, Comisión de lo Jurídico del Senado de Puerto Rico, 2002, Vol. II.

Ahora bien, somos conscientes que el tipo del delito proscribe los "oprobios" sobre los cuales el Tribunal Supremo de Estados Unidos ha pasado juicio en cuanto a su naturaleza y protección constitucional. Recordamos que en Gooding v. Wilson, supra, el Más Alto Foro federal discutió la constitucionalidad de una ordenanza estatal que penalizaba la alteración a la paz de una persona mediante el uso de expresiones oprobiosas. Ciertamente en esa ocasión dicho Foro decretó la nulidad del estatuto por adolecer de amplitud excesiva. No obstante, advertimos que el fundamento para tal determinación fue la interpretación irrestricta de la palabra *oprobio* que realizó el Tribunal Supremo de Georgia; **esto es, dicho foro no limitó el término *oprobio* a aquellas instancias en las cuales constituyera palabra de riña.**

Resulta pertinente aclarar que en el mencionado caso, al igual que en Lewis v. City of New Orleans, supra, el Tribunal Supremo federal examinó la jurisprudencia estatal para determinar cuál había sido la interpretación y el patrón de aplicación de las ordenanzas impugnadas en las cortes estatales. Luego de ello, y en función de sus hallazgos, concluyó que en ambas instancias se había acogido el término *oprobio* según su significado literal, omitiendo así limitar la aplicación del término a las palabras de riña.

La discusión del Tribunal Supremo federal en ambos casos revela que la naturaleza de las expresiones

oprobiosas y su posible protección constitucional dependerán del contexto en que se penalice y -más aún- de la interpretación limitada o ilimitada que le confieran los tribunales estatales. Este razonamiento es igualmente aplicable a los vituperios y a las palabras ofensivas. Ello se debe a que, contrario a las manifestaciones desafiantes, provocativas o insultantes también proscritas en el Artículo 247(c), *supra*, las definiciones de "vituperios", "oprobios" y "palabras ofensivas" no revelan una invitación directa a la confrontación o a la violencia. **La característica de riña la adquieren dependiendo de las circunstancias particulares en las que sean proferidas y el efecto violento que éstas puedan tener en la persona a las que van dirigidas, ello examinado desde el punto de vista de un individuo de inteligencia común.**

Aclarado este punto, concluimos que el Artículo 247(c) del Código Penal de 2004, *supra*, es constitucionalmente válido. El texto del inciso (c) impugnado evidencia de forma inequívoca que las manifestaciones proscritas pueden ser penalizadas en tanto y en cuanto éstas constituyan palabras de riña. Es decir, el delito de alteración a la paz se entenderá configurado cuando los vituperios, oprobios, desafíos, provocaciones y palabras insultantes u ofensivas tiendan a provocar una reacción violenta inmediata en el receptor del mensaje. Su redacción e interpretación limitada cumple con los

parámetros constitucionales que cobijan el derecho a la libertad de expresión.

V

Por último, nos corresponde resolver si la culpabilidad del señor García Colón fue probada más allá de duda razonable. El peticionario alega que el Ministerio Público omitió presentar evidencia sobre el estado de ánimo de los agentes previo a la intervención de tránsito. Este dato, añade, era indispensable para poder determinar si los policías se encontraban en paz, de forma tal que las acciones del peticionario pudieran alterarle ese estado emocional. Asimismo, argumenta que las expresiones penalizadas gozan de una mayor protección bajo el palio de la cláusula de libertad de expresión al haber sido proferidas en contra de los policías. Ello se debe a que las manifestaciones realizadas por el peticionario constituían una crítica a las actuaciones arbitrarias cometidas por el Estado a través de sus funcionarios, que en este caso eran los agentes del orden público cuya paz supuestamente fue alterada.

La Carta de Derechos de la Constitución de Puerto Rico reconoce como un imperativo constitucional que "en todos los procesos criminales, el acusado disfrutará del derecho a gozar de la presunción de inocencia…". Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo I. Cónsono con ello, nuestro ordenamiento procesal penal preceptúa que todo acusado de delito se presumirá inocente hasta que se

demuestre lo contrario más allá de duda razonable. Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110. El peso de la prueba recae en el Estado, quien deberá presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado. Pueblo v. Santiago *et al.*, 176 D.P.R. 133, 143 (2009); Pueblo v. Rivera Ortiz, 150 D.P.R. 457 (2000); Pueblo v. Ramos y Álvarez, 122 D.P.R. 287, 315-316 (1988).

En múltiples ocasiones hemos pautado que la presunción de inocencia se rebate con la presentación de prueba satisfactoria y "suficiente en derecho"; es decir, el Estado tiene que ofrecer prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 100 (2000); Pueblo v. De León Martínez, supra, págs. 764-765; Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R. 545, 552 (1974). La duda razonable que acarrea la absolución del acusado no es una duda especulativa o imaginaria, ni cualquier duda posible. Más bien, es aquella duda producto de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso. En concreto, la duda razonable existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada. Pueblo v. Santiago *et al.*, supra, pág. 142; Pueblo v. Irizarry, supra, pág. 788; Pueblo v. Maisonave

Rodríguez, supra; Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986).

Anteriormente indicamos que uno de los elementos del delito de alteración a la paz en su modalidad de expresiones de riña, tipificado en el inciso (c) del Artículo 247, *supra*, es que la paz de la víctima sea efectivamente alterada. Para que este elemento se configure es necesario que la persona se encontrase en un estado de paz y tranquilidad previo a escuchar las manifestaciones proferidas en su contra. Es evidente que en ausencia de este requisito, intrínseco al elemento subjetivo del delito tipificado en el inciso (c) del Artículo 247 del Código Penal, *supra*, no estaríamos ante una alteración a la paz propiamente, puesto que no existía ninguna paz o tranquilidad que pudiese ser alterada.

Consecuentemente, el estado de ánimo de la víctima antes de llevarse a cabo las manifestaciones supuestamente delictivas es un factor sobre el cual el Ministerio Público tiene que pasar prueba a los fines de evidenciar que la víctima estaba en un estado de paz antes de escuchar las manifestaciones. El presumir que la persona se encontraba en un estado de tranquilidad debido a las condiciones y circunstancias en donde se llevó a cabo la manifestación, no es suficiente en derecho para sobrepasar el *quantum* de prueba más allá de duda razonable. La naturaleza subjetiva de este elemento del delito implica que el estado anímico de la persona afectada no

necesariamente tiene que coincidir con el ambiente externo que lo rodea.

La prueba desfilada en el caso de autos no refleja información alguna respecto al estado emocional de los dos policías presuntamente afectados previo a la intervención con el peticionario por una infracción de tránsito. Una lectura integral de la exposición narrativa de la prueba, particularmente del testimonio vertido por los agentes González Aponte y Rivera Colón, apunta a que el Ministerio Público omitió inquirir sobre este aspecto subjetivo del delito. Si bien es cierto que ambos policías declararon haberse sentido "ofendidos y molestos" por las expresiones del peticionario, no es menos cierto que en ningún momento manifestaron cómo se sentían antes de intervenir con aquél.

La Procuradora General argumenta en su alegato que los agentes del orden público se hallaban en estado de paz al momento de la intervención. Esta inferencia la sostiene en el hecho de que, a su entender, la detención se llevó a cabo bajo un ambiente en donde imperaba el buen orden y en que los agentes se encontraban realizando su trabajo habitual.[37] Añade que "nada hay en el récord que indique lo contrario".[38] Estos planteamientos no nos persuaden.

---

[37] Alegato de la Procuradora General, pág. 19.

[38] Íd.

Anteriormente indicamos -y es doctrina reiterada- que el peso de probar la culpabilidad de un acusado más allá de duda razonable recae en el Estado. Esta norma cardinal en materia de derecho penal le exigía al Ministerio Público en el presente caso, como entidad acusadora, la obligación de presentar evidencia suficiente en derecho sobre la concurrencia de todos los elementos del delito de alteración a la paz y su conexión con el peticionario. La existencia de alguno de estos factores, incluso sobre el estado emocional de los agentes previo a la intervención con el acusado, no puede presumirse por el juzgador de los hechos.

Igualmente, la ausencia de información alguna en el expediente tendente a demostrar un ambiente hostil o que propendiera a alterarle la tranquilidad a los policías antes de la intervención de tránsito, no justifica reconocer como un hecho probado que los agentes estaban en paz. La premisa de la Procuradora General más bien presupone el reconocimiento de una presunción a favor del Ministerio Público sobre el estado de "paz" de los agentes previo a las manifestaciones del peticionario. Esto tendría el efecto indeseado de transferir al acusado el peso de probar la inexistencia de uno de los elementos del delito imputado. Dicha exigencia sería claramente contraria a las normas básicas y más elementales del derecho penal, en específico a la presunción de inocencia que cobija al acusado.

En definitiva, la omisión del Ministerio Público en presentar evidencia sobre el estado anímico de los agentes del orden público previo a que el peticionario profiriera las manifestaciones en controversia, torna en insuficiente la prueba presentada para sostener una convicción por el delito de alteración a la paz. Incluso, somos del criterio que las declaraciones de los agentes a los efectos de que se sintieron "molestos y ofendidos" por las expresiones del peticionario no son suficientes para configurar el elemento subjetivo del delito, esto es, que en efecto se les alteró la paz. Nos explicamos.

En múltiples ocasiones hemos pautado que el malestar que pueda sentir una persona por las expresiones de otro individuo en su contra no es motivo suficiente para entender que se le ha alterado la paz al primero. A esos efectos, la expresión o conducta desplegada por el acusado tiene que ser de tal grado ofensiva, hiriente e irritante, capaz de provocar una reacción violenta inmediata en la persona que la escucha o recibe. Para llegar a esta conclusión el juzgador de los hechos debe examinar las palabras proferidas a la luz de la totalidad de las circunstancias y desde la perspectiva de un hombre de inteligencia común. Desde ese crisol, deberá analizar si las expresiones pueden ocasionar que una persona promedio o de sensibilidad ordinaria reaccione violentamente o con ira.

Ahora bien, existen circunstancias particulares en las cuales el estándar para evaluar la naturaleza de las palabras expresadas debe ser más estricto. Entre ellas podemos mencionar aquellos casos en donde la alegada víctima del delito es un policía. **La razón primordial para esta distinción estriba en el amplio grado de protección que le confiere la Primera Enmienda de la Constitución de Estados Unidos a la crítica y al cuestionamiento verbal a las instituciones gubernamentales, incluso a los agentes del orden público.**[39]

Asimismo, la función de la Policía como entidad encargada de mantener y preservar un estado de ley y orden en la sociedad, presupone que los agentes que la integran estén entrenados para ejercitar un mayor grado de autorrestricción en comparación a un ciudadano común.[40] En ese sentido, de ordinario y desde un punto de vista objetivo, las expresiones "charlatán y corrupto" -si bien pueden provocar un sentimiento de molestia y frustración en el receptor- no deben considerarse lo suficientemente ofensivas e hirientes capaces de provocar una reacción violenta en un agente del orden público promedio que se encuentre en funciones.

Cabe aclarar que lo anterior no significa que los policías estén excluidos de la protección del delito de alteración a la paz mientras se encuentren en el ejercicio

---

[39] Véase Houston v. Hill, supra, a la nota 22.

[40] Íd.; Pueblo v. Caro González, 110 D.P.R. 518, 529 (1980).

de sus funciones. Por el contrario, los agentes del orden público, como individuos y miembros de esta sociedad, están cobijados por los principios constitucionales que promulgan la dignidad del ser humano y la igual protección de las leyes. Su honra y reputación ostentan el mismo valor que aquellas de cualquier ciudadano común. Sin embargo, el alto grado de control de sus emociones que se le requiere al policía para desempeñar su trabajo, es un elemento que tiene que ser considerado al momento de determinar el efecto de las palabras y la probabilidad de que éstas puedan desatar una reacción violenta de su parte.

Cónsono con ello, un ciudadano puede estar sujeto a una acción criminal al amparo del Artículo 247(c) del Código Penal, *supra*, aun cuando el receptor del mensaje sea un agente de la policía. La imposición de responsabilidad penal deberá estar sustentada en evidencia que demuestre más allá de duda razonable la concurrencia de todos los elementos del delito. Esto incluye la determinación de la naturaleza de las palabras proferidas examinadas desde un punto de vista objetivo a la luz de la totalidad de las circunstancias.

En el caso de autos, las palabras expresadas por el peticionario fueron dirigidas a dos agentes de la policía. Según se desprende de la transcripción de la prueba oral, el señor García Colón le manifestó a los agentes González Aponte y Rivera Colón que eran unos "charlatanes,

corruptos y que no valían nada". Estas palabras, examinadas dentro del contexto en que se dijeron y el efecto que produjeron en su receptor, no constituyen palabras de riña capaces de alterarle la paz a los policías implicados.

En atención a la discusión que antecede, resolvemos que en el presente caso no se configuró el delito de alteración a la paz según tipificado en el inciso (c) del Artículo 247 del Código Penal, *supra*. Dadas las circunstancias particulares del caso y luego de examinar la transcripción de la prueba oral que obra en autos, concluimos que las expresiones proferidas por el peticionario -si bien pudieron haber provocado en los policías un sentimiento de molestia y frustración- no constituyeron palabras de riña capaces de provocar una reacción violenta inmediata según lo proscribe el Artículo 247(c) del Código Penal, *supra*.

No obstante, resulta pertinente aclarar que la conducta desplegada por el peticionario en contra de los agentes González Aponte y Rivera Colón es altamente reprobable. Ciertamente, en nuestra sociedad democrática los ciudadanos gozan del derecho primordial a la libertad de expresión. Ante la preeminencia de este derecho, reiteramos una vez más su celosa protección y su jerarquía entre los derechos fundamentales que nos cobijan. Ahora bien, el ejercicio de la libre expresión debe estar enmarcado dentro del respeto y la dignidad que ampara a

todos los ciudadanos. Así, pues, este derecho no constituye una carta blanca que nos permita infringir **la dignidad del ser humano.**

En ese contexto, el derecho a la expresión debe ejercitarse con prudencia de forma tal que no interfiramos con los derechos constitucionales que igualmente cobijan a los demás ciudadanos. Así, reafirmamos que los miembros de la Policía de Puerto Rico también son susceptibles de ser considerados víctimas del delito de alteración a la paz, siempre y cuando se demuestre más allá de duda razonable los elementos objetivos y subjetivos constitutivos del delito.

## VI

Por los fundamentos expuestos, expedimos el auto de *certiorari* solicitado y modificamos parcialmente la Sentencia dictada por el Tribunal de Apelaciones. Por una parte, confirmamos la determinación de dicho foro en cuanto resolvió que el derecho a juicio rápido del Sr. Mario García Colón no se violentó en el presente caso. Asimismo confirmamos la decisión de decretar la constitucionalidad del Artículo 247(c) del Código Penal de 2004, *supra*. Sin embargo, revocamos el dictamen impugnado respecto a la determinación de culpabilidad del peticionario por el delito de alteración a la paz.

Se dictará sentencia de conformidad.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico
     Recurrido

        v.                                   Certiorari

                        CC-2009-0912

Mario García Colón
     Peticionario

SENTENCIA

San Juan, Puerto Rico, a 9 de junio de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se expide el auto de *certiorari* presentado y se modifica parcialmente la Sentencia dictada por el Tribunal de Apelaciones. Por un lado, se confirma la determinación del foro apelativo intermedio en cuanto resolvió que el derecho a juicio rápido del peticionario no se violentó, como también se confirma la decisión de decretar la constitucionalidad del Artículo 247(c) del Código Penal de 2004, *supra*. Por otro lado, se revoca el dictamen impugnado en cuanto a la determinación de culpabilidad del peticionario por el delito de alteración a la paz.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió una Opinión Concurrente y Disidente a la cual se unió la Jueza Asociada señora Fiol Matta. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Concurrente y Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        v.                       CC-2009-912      Certiorari

Mario García Colón

    Peticionario

Opinión Disidente y Concurrente emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON a la cual se une la Jueza Asociada SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 10 de junio de 2011

La Opinión que emite hoy este Tribunal revoca correctamente la convicción de alteración a la paz que pesaba sobre el peticionario, pero en el camino deja malherida la protección constitucional que tiene todo ciudadano a un juicio criminal rápido e ignora el principio de autolimitación judicial del cual hemos sido celosos guardianes desde hace medio siglo. Véase <u>E.L.A. v. Aguayo</u>, 80 D.P.R. 552 (1958). Por ello, concurrimos con el resultado de revocar la referida convicción criminal, pero disentimos de lo pautado en torno a lo que constituye "justa causa" para la dilación de los términos de juicio rápido. Asimismo, discrepamos del ejercicio de

examinar innecesariamente la constitucionalidad del delito de alteración a la paz.

I.

El 15 de noviembre de 2006, dos oficiales de la Policía detuvieron al Sr. Mario García Colón porque éste presuntamente no guardaba suficiente distancia entre su vehículo y el de otros conductores, en violación al Art. 10.10 de la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 5290. Mientras los policías expedían el boleto, el señor García Colón se bajó del auto, apuntó con su dedo a los agentes y les expresó que eran "unos charlatanes, corruptos y que no valían nada".

Los agentes Ángel González Aponte y Omar Rivera Colón llamaron a su supervisor, el sargento Pedro Pagán Matos, y éste le informó al peticionario la manera para impugnar el boleto de tránsito. El señor García Colón repitió que los agentes que intervinieron con él eran charlatanes y corruptos. Así las cosas, el sargento Pagán Matos procedió a expedirle una citación para que compareciera el **28 de noviembre de 2006** ante el Tribunal de Primera Instancia por el delito menos grave de resistencia u obstrucción a la autoridad pública, tipificado en el Art. 252 del Código Penal, 33 L.P.R.A. sec. 4880. El señor García Colón acudió al tribunal la fecha en que fue citado.

Es en **mayo de 2007,** medio año después de la citación expedida para comparecer al tribunal, que el Ministerio Público finalmente presentó las denuncias contra el señor

García Colón. Según declaró el sargento Pagán Matos en la vista de causa para arresto cuando ésta finalmente se celebró, la tardanza en el procesamiento penal del señor García Colón se debió a varios factores: alegadamente no había secretarias disponibles en el cuartel de la Policía para tramitar las denuncias; él se enfermó durante dos meses y no pudo trabajar en la Policía ni acudir al tribunal; y, por último, el abogado del señor García Colón nunca pudo acordar con él una fecha para comparecer. Las denuncias finalmente se presentaron medio año después, el proceso se llevó a cabo y el señor García Colón resultó culpable por el delito menos grave de alteración a la paz. Inconforme, el señor García Colón acudió al Tribunal de Apelaciones, que confirmó la sentencia del Tribunal de Primera Instancia. Aun insatisfecho, el peticionario comparece ante nos por *certiorari*, el cual expedimos.

Los planteamientos del señor García Colón, que se han hecho oportunamente en todas las fases, incluyen: (a) que el proceso criminal se realizó en violación a los preceptos constitucionales de juicio rápido, Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1, y a lo dispuesto en la Regla 64(n)(2) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 64, ya que no se presentó denuncia dentro de los 60 días de la citación emitida sino seis meses después de dicha citación; (b) que el delito de alteración a la paz recogido en el Art. 247 del Código Penal es inconstitucional porque es excesivamente amplio o adolece de vaguedad, ya que

proscribe expresiones y comportamiento que una persona de inteligencia promedio no sabría identificar razonablemente; y (c) que el delito de alteración a la paz no puede configurarse contra un policía en funciones que reclama ser víctima, pues los policías están adiestrados para trabajar en situaciones conflictivas y deben estar siempre alertas y operando con sospechas. Por ello, según el peticionario, no se les puede alterar la paz a los policías en el sentido que implica el delito. Por último, el peticionario sostiene que (d), en este caso particular, no se configuró el delito porque el Ministerio Público falló en desfilar prueba sobre el estado mental de los agentes.

## II.

### A. Juicio rápido

La Regla 64 (n)(2) de Procedimiento Criminal, *supra*, dispone que habrá causa para desestimar la acusación o denuncia contra un imputado si ésta no se presenta "dentro de los sesenta días de su arresto o citación o dentro de los treinta días si se tratare de un caso en que un magistrado autorizó la radicación de las mismas de conformidad con lo dispuesto en la Regla 6(a)". El derecho a juicio rápido cobra vigencia desde que una persona está detenida o sujeta a responder; es decir, luego de que se activa la maquinaria procesal que podría culminar en una convicción. Pueblo v. Miró González, 133 D.P.R. 813, 821 (1993).

No obstante, la "mera inobservancia de los términos de la Regla 64(n) de Procedimiento Criminal no constituye, por

sí sola, una violación al derecho a juicio rápido". <u>Pueblo v. Guzmán</u>, 161 D.P.R. 137, 152 (2004). Los términos pueden ser extendidos si existe justa causa o si la demora ha sido ocasionada por el propio acusado. *Íd.*

Como se sabe, hemos delimitado cuatro criterios para analizar qué tipo de dilación viola los términos del derecho a juicio rápido, derecho que, valga repetirlo, es de raigambre constitucional. <u>Pueblo v. Rivera Tirado</u>, 117 D.P.R. 419, 432 (1986). Estos criterios son: (1) la duración de la tardanza, (2) las razones para la dilación, (3) si el acusado invocó oportunamente el derecho a juicio rápido, y (4) el perjuicio resultante de la tardanza. *Íd.*

Al amparo de dicha normativa, es forzoso concluir que, en este caso, la tardanza entre la citación expedida y la presentación de las denuncias excedió los seis meses, cuatro meses más del límite dispuesto por ley. Las razones para la dilación fueron una enfermedad del sargento denunciante y la supuesta ausencia de secretarias en el cuartel policíaco, ambas situaciones atribuibles al Estado. Asimismo, el señor García Colón invocó oportunamente su derecho a juicio rápido y hubo un perjuicio resultante de la referida tardanza.[41] Aun

---

[41] Los cuatro criterios que hemos esbozado en <u>Pueblo v. Rivera Tirado</u>, *supra*, para determinar si se violó el derecho a juicio rápido que cobija a toda persona que enfrenta una acusación criminal "deben examinarse en conjunto y con otras circunstancias relevantes". E.L. Chiesa Aponte, <u>Derecho procesal penal de Puerto Rico y Estados Unidos</u>. Tomo II, Colombia, Ed. Forum, 1995, pág. 88. Ninguno de los factores, por sí solo, es determinante. <u>Pueblo v. Rivera Tirado</u>, *supra*, pág. 433.

si tomáramos como cierto que no hubo perjuicio alguno resultante de la dilación de seis meses, como propone la mayoría, "el balance de los otros tres factores puede ser tan favorable al acusado como para que éste prevalezca en su invocación de su derecho a juicio rápido". E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos. Tomo II, Colombia, Ed. Forum, 1995, pág. 96. Por ello, somos del criterio que hubo una violación clarísima al derecho a juicio rápido y, en este aspecto, nos vemos forzados a disentir.

La Opinión del Tribunal expone que, en el procesamiento criminal del señor García Colón, hubo justa causa para la dilación de seis meses – **cuatro meses más de lo dispuesto por ley** – porque presuntamente no había secretarias en el cuartel de la Policía cierto día y porque el sargento que presentaría las denuncias – al parecer el único con esa capacidad – se enfermó durante dos meses sin que los dos agentes interventores o ninguna otra persona pudiera sustituirlo en esa faena.[42] La Opinión concluye que, por la

---

[42] La Opinión del Tribunal aduce en su escolio 31 que los policías que originalmente intervinieron con el peticionario no debían ser quienes presentaran las denuncias porque fueron ellos las víctimas del delito de resistencia u obstrucción a la autoridad pública, posteriormente reclasificado como alteración a la paz. Por lo anterior, había un conflicto de interés claro si los policías interventores presentaban las denuncias, una situación que, según la Opinión del Tribunal, podía exponer a los agentes de ley y orden a penalidades bajo la Ley Núm. 12 de 24 de julio de 1985, según enmendada, conocida como la Ley de Ética Gubernamental, e incluso llevarlos a enfrentar sanciones administrativas al amparo del Reglamento Núm. 4216 del 11 de mayo de 1990, según enmendado, conocido como

supuesta ausencia de secretarias el 28 de noviembre de 2006 y la enfermedad de un agente policiaco, el Ministerio Público no pudo someter las denuncias a tiempo.

Aun si tomáramos la supuesta ausencia de secretarias como cierta, en el pasado hemos dicho, con meridiana claridad, que "las tardanzas institucionales, entre éstas, la enfermedad de un juez, receso por vacaciones del tribunal y la congestión en el calendario, son imputables al Estado". Pueblo v. Candelario, 148 D.P.R. 591, 598 (1999). Si así nos hemos expresado al referirnos a dilaciones atribuibles a los tribunales, debemos ser aún más rigurosos cuando la tardanza se debe a asuntos que el Estado tiene en su pleno control, como son los recursos humanos de los cuarteles policíacos. Es insostenible el fundamento de que la ausencia de secretarias un día en un cuartel policíaco es justa causa – o un factor que contribuye a ella – para no procesar a alguien en el término dispuesto por la Constitución y la ley.

Ante la ausencia de la secretaria, el policía – o cualquier otro funcionario en el cuartel – podía

Reglamento de la Policía de Puerto Rico. Sostiene la Opinión del Tribunal que, "consecuentemente, es necesario que el agente víctima de delito refiera el asunto a su supervisor u otro miembro de la Policía que no tenga conflicto". La Opinión del Tribunal justifica así la "idoneidad" de que fuera el sargento – quien se enfermó por dos meses – el que presentara la denuncia. Discrepamos de la interpretación de la mayoría de que, de ahora en adelante, todo agente policíaco víctima de alteración a la paz, agresión, motín, exposiciones inmorales, proposiciones obscenas, espectáculos obscenos, resistencia u obstrucción a la autoridad pública, o cualquier otro delito, esté privado de cumplir su deber ministerial de presentar las correspondientes denuncias.

cumplimentar el formulario necesario para presentar las denuncias ante el tribunal. Más aún, el policía podía procurar la ayuda del personal secretarial en las oficinas del Ministerio Público ubicadas en los tribunales. En cualquier caso, y como alternativa a los dos escenarios previos, el agente podía volver al día siguiente al cuartel para que la secretaria cumplimentara la denuncia. O podía intentarlo una vez más al día siguiente, o al siguiente, y así sucesivamente por el término razonable de dos meses establecido por ley. Pero nada de lo anterior sucedió.

Mediante esta decisión el mensaje que le envía este Tribunal a la Policía es que, si se les ha pasado el término dispuesto en ley para presentar cierta denuncia, siempre pueden recurrir al argumento de que se ausentaron las secretarias en un cuartel o no estaban disponibles. No es cierto que el procesamiento criminal en Puerto Rico se paraliza si en un cuartel no hay secretarias disponibles para cumplimentar un formulario. El sistema de justicia criminal en nuestro país tiene un andamiaje – tanto desde el Poder Ejecutivo como del Judicial – para que haya suficientes recursos en los cuarteles de la Policía, en el Ministerio Público y en los tribunales que le permitan a un agente presentar la denuncia correspondiente.

En resumen, pues, la supuesta ausencia de secretarias durante un día, sólo un día, en un cuartel de la Policía (uno solo), no se puede esgrimir con seriedad como "justa causa", o elemento de ella, para la dilación de seis meses

en el proceso criminal de una persona. Es cierto que el juicio rápido no es un concepto incompatible con cierta tardanza, pero la demora no debe ser intencional ni opresiva. Pueblo v. Candelario, *supra*. En este caso, la tardanza de seis meses en procesar al peticionario luego de su citación fue, cuando menos, negligente y, entendemos, opresiva. No hay justificación alguna para una demora de seis meses, mucho menos bajo los pretextos esbozados de que el sargento se enfermó y de que presuntamente no había secretarias en el cuartel para tramitar las denuncias.

Coincidimos con la Opinión mayoritaria cuando, citando a Pueblo v. Guzmán, *supra*, pág. 154, dice que los términos de juicio rápido deberán evaluarse caso a caso y dentro de los parámetros de razonabilidad. Estamos convencidos, sin embargo, que una dilación de seis meses – cuatro en exceso de lo permitido por ley – es la definición de la irracionabilidad, máxime cuando se esgrimen como justa causa la falta de secretarias en un cuartel de la Policía, la falta de efectividad del Estado en acordar una fecha con el abogado defensor, y la ausencia de un policía particular durante dos meses – no seis – que supuestamente era el más idóneo para el trámite de presentar las denuncias.

La Opinión del Tribunal también atribuye al compareciente la responsabilidad por la dilación de medio año en el procesamiento criminal al señalar que su abogado fue reticente en acordar con el policía una nueva fecha para someter el caso. Este argumento surge de la premisa

equivocada de que los abogados de defensa tienen un poder decisivo en la tramitación del procesamiento criminal, una tarea que – por definición – recae sobre el Estado. La falta de acuerdo entre un policía y un abogado de defensa para seleccionar una fecha posterior no acarrea, como consecuencia natural, el paso de seis meses sin que se efectúe el proceso.

Cabe recordar que el peso de la prueba en un juicio criminal lo tiene el Estado, y, por ende, la diligencia de presentar denuncias y de fijar fechas de citación – con o sin la aquiescencia del abogado defensor – recae sobre el Ministerio Público. Una negativa por parte de un abogado de defensa de comparecer a una cita en cierta fecha no detiene el proceso ni inhabilita al Estado para hacer su trabajo. Decir lo contrario, como hace la Opinión del Tribunal, no sólo es errado, sino que les atribuye a los abogados de defensa un poder que, aunque quizás quisieran, en realidad no tienen.

Por otra parte, otra de las razones que esboza este Tribunal para intentar justificar la demora de seis meses en el procesamiento criminal fue la enfermedad del sargento Pagán Matos, quien presentó la denuncia. No obstante, la enfermedad del referido sargento fue de dos meses, como reconoce la propia Opinión del Tribunal. Aun si tomáramos como cierto que el sargento Pagán Matos era el único en la Policía que tenía la facultad para presentar la denuncia, la mayoría del Tribunal no aclara cómo una enfermedad de dos

meses redunda en una dilación de seis meses en la presentación de los cargos en un proceso criminal.

Los propósitos esenciales del derecho a juicio rápido son evitar la opresión del Estado contra el individuo antes del juicio, minimizar la ansiedad y preocupación que genera una acusación pública, y limitar las posibilidades de que una dilación extensa menoscabe la capacidad del acusado para defenderse. Véanse U.S. v. Ewell, 383 U.S. 116 (1966), Smith v. Hoeey, 393 U.S. 374 (1969); y U.S. v. MacDonald, 456 U.S. 1 (1982), citados en E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos. Tomo II, Colombia, Ed. Forum, 1995, pág. 70.

No obstante, más allá de los derechos constitucionales individuales, el juicio rápido también protege intereses que trascienden los del acusado y que, en ocasiones, están abiertamente en contraposición a los de éste. Véase Barker v. Wingo, 407 U.S. 514 (1972). Anteriormente hemos advertido que "para algunos acusados el propiciar suspensiones 'adelanta' sus causas, pues contribuye al deterioro de evidencia por la indisponibilidad de testigos – ausencia, desaparición o muerte – y pérdida de la memoria sobre hechos esenciales. […] Al protagonista del esquema forense penal le resulta ventajoso controlar indirectamente el momento en que se ventile el caso en su fondo". Pueblo v. Rivera Navarro, 113 D.P.R. 642, 646-47 (1982).

Asimismo, pautamos desde hace décadas que el derecho a juicio rápido no es de interés exclusivo de los acusados,

sino de todos los miembros de la sociedad que desean que se haga justicia contra quienes presuntamente infringieron la sana convivencia. A tales efectos, expresamos entonces que:

Si bien es cierto que los acusados tienen el derecho – constitucionalmente garantizado – de que se les celebre juicio sin demora, no es menos cierto que la sociedad demanda que aquellos a quienes se acusa de violentar sus leyes sean juzgados prontamente. El juicio rápido es un derecho tanto del acusado como del pueblo. Rodríguez Cintrón v. Tribunal Superior, 104 D.P.R. 27, 31 (1975).

Más aún, en momentos de austeridad fiscal en el Gobierno y en todo Puerto Rico, es menester recordar que las demoras excesivas que hoy avala este Tribunal en el procesamiento contra los acusados conllevan "desembolsos que no sólo gravan la rama judicial, sino a los demás componentes principales e incidentales del sistema: policía, fiscales, asistencia legal y ciudadanía general". Pueblo v. Rivera Navarro, *supra*. Este tipo de tardanza, máxime si es de varios meses como en el presente caso, "afecta y debilita la confianza en la administración de la justicia y fomenta un sentido de injusticia, inseguridad e incertidumbre por la tardanza en la determinación final fáctica y jurídica de la controversia". *Íd.*

Con la decisión de hoy, ha quedado sin fuerza alguna y languideciendo la exigencia constitucional de que el Estado tramite con rapidez los juicios en los que pretende penalizar a un ciudadano por una conducta presuntamente delictiva. Este Tribunal no solamente le da una estocada a los derechos constitucionales del individuo, sino a los de todos los ciudadanos que padecen la delincuencia en Puerto

Rico y que quieren ver a nuestro sistema de justicia exigiendo rapidez y diligencia en los procesos criminales contra los acusados.

Una vez más nos vemos forzados a reiterar, con el mayor respeto, que justicia tardía no es justicia.[43] Lamentablemente, por segunda vez en poco tiempo, tenemos que repetir que "la decisión del Tribunal ignora el reclamo público de mayor agilidad, laboriosidad y eficiencia en los procesos judiciales". In re: Carmen H. Pagani Padró, res. el 5 de abril de 2011, 2011 T.S.P.R. 51 (Opinión Concurrente y Disidente emitida por el Juez Presidente señor Hernández Denton). En efecto, este Tribunal deja inoperante y a merced de interpretaciones arbitrarias el término para incoar los procesos contra los imputados de delinquir.

No obstante, aun si tomáramos por bueno el análisis del Tribunal sobre la validez y justificación para que el procesamiento criminal del peticionario tardara seis meses, teníamos otra oportunidad para ceñirnos a la autolimitación judicial y resolver sin entrar a evaluar méritos constitucionales del delito de alteración a la paz.

**B. Insuficiencia de prueba sobre el delito de alteración a la paz**

Uno de los elementos esenciales del delito de alteración a la paz recogido en el Art. 247 del Código Penal es que la persona perjudicada se encuentre en paz, Pueblo v.

---

[43] William E. Gladstone, *Speech in House of Commons, British Parliament*, 16 Mar. 1868, en The Yale Book of Quotations, Ed. F. Shapiro, Yale University Press, New Haven and London, pág. 312.

De León Martínez, 132 D.P.R. 746, 767 (1993). Como consecuencia, es necesario que el fiscal que pretenda probar el delito de alteración a la paz presente prueba sobre el estado o condición mental del perjudicado. Para configurarse el delito, pues, los policías debían estar en paz al momento de los hechos, de modo que se les alterara el ánimo no previamente predispuesto. En este caso, el Ministerio Público no presentó prueba del estado mental de los supuestos perjudicados para que el juzgador determinara si podía configurarse el delito en su contra. Por ello, la mayoría de este Tribunal correctamente revocó la convicción de alteración a la paz que pesaba contra el señor García Colón. Si el análisis sobre juicio rápido no era suficiente para disponer del caso, la insuficiencia de prueba sin duda lo era. Y ahí debió haber culminado nuestra intervención en el presente caso.

### C. Autolimitación judicial

Este Tribunal tuvo dos oportunidades – el análisis sobre el derecho a juicio rápido y el de insuficiencia de prueba – para autolimitar su rol y resolver sin entrar en los méritos constitucionales de un estatuto aprobado por las ramas políticas. No obstante, desperdició sendas oportunidades. Desde hace medio siglo, en el paradigmático E.L.A. v. Aguayo, *supra*, adoptamos las guías de autolimitación judicial que el Juez Asociado del Tribunal Supremo de Estados Unidos, Louis Brandeis, expuso en su Opinión Concurrente en Aswander v. Tennessee, 297 U.S. 288,

346 (1935). Entre las guías de autolimitación judicial mencionadas entonces, que debemos repasar hoy, figuran que el Tribunal "no se anticipará a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo" y que "la Corte no juzgará una cuestión constitucional aunque haya sido sometida propiamente en los autos, si también se somete un fundamento de otra índole que permita disponer del caso". E.L.A. v. Aguayo, *supra*, pág. 596.

No obstante todo lo anterior, este Tribunal decide hoy que, pese a que podemos resolver el presente caso por la exigencia de juicio rápido o, en la alternativa, por insuficiencia de prueba, prefiere seguir y evaluar la constitucionalidad del delito de alteración a la paz. Así, resuelven que el referido delito es en efecto constitucional.

Coincidimos en que este caso no es el apropiado para declarar inconstitucional el delito de alteración a la paz. Sin embargo, alcanzamos ese resultado no por evaluar los méritos del delito, como hace el Tribunal innecesariamente, sino porque, como ya explicamos, la autolimitación judicial nos exige resolver el caso por otros medios que no sean el análisis constitucional. Véase E.L.A. v. Aguayo, *supra;* Aswander v. Tennessee, *supra;* Pan Am. Computer Corp. v. Data Gen. Corp., 112 D.P.R. 780 (1982); Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716 (1982).

**III.**

La autolimitación judicial tiene razones históricas, políticas y jurídicas que le han servido bien a nuestro sistema constitucional de separación de poderes. Una mayoría de este Tribunal ignora hoy ese principio básico – cimentado en nuestra jurisprudencia desde E.L.A. v. Aguayo, *supra* – y concluye que el delito de alteración a la paz es constitucional. Realmente es sorprendente esta determinación si simultáneamente la Opinión llegó a la conclusión de que no se probaron los elementos del delito. Una vez se llega a la conclusión de que no se configuraron los elementos del delito, lo procedente era revocar el dictamen recurrido sin ulterior pronunciamiento. No obstante, en el día de hoy el Tribunal ha emitido una Opinión que consiste en gran parte en un dictum, pues todo lo dicho luego de resolver que no había suficientes elementos del delito era innecesario e inmeritorio.

La metodología adjudicativa constitucional claramente dispone que los tribunales no deben abundar sobre cuestiones que no es necesario atender. Al resolver de esta manera, la impresión que puede dejar en un estudioso de la normativa del Tribunal es que esta Curia quería pronunciarse sobre la validez de la ley aunque en estricto derecho no era necesario hacerlo.

Por otra parte, la decisión de una mayoría de este Tribunal deja inoperante – y sujeta a la arbitrariedad con la que el Ministerio Público quiera tratarla – la "justa causa" que se requiere para obviar los términos de juicio

rápido que nuestra Constitución y nuestras leyes ordenan. Así, no sólo atenta contra los derechos constitucionales que cobijan al individuo, sino que también resuelve contra el interés colectivo de nuestra sociedad, consternada por la delincuencia, de que se atiendan con la mayor premura los procesamientos criminales contra los imputados o acusados de delitos.

Por último, y a modo de epílogo, coincidimos con la Opinión Disidente y Concurrente de la compañera Juez Asociada señora Rodríguez Rodríguez en cuanto a la primacía que debe tener en nuestro sistema jurídico y social el derecho a la libertad de expresión. Este valor fundamental, que ha sido resaltado por el Tribunal Supremo federal en situaciones tan complejas como la que se presentó en el reciente caso de Snyder v. Phelps, 562 U.S. ___ (2011), no debe ser limitado mediante dictum como el que emite hoy este Tribunal.

Por todo lo anterior, disentimos respetuosamente de la Opinión del Tribunal en cuanto a estos asuntos. No obstante, concurrimos con la Opinión del Tribunal porque alcanza el resultado correcto al revocar la convicción de alteración a la paz que pesaba sobre el señor García Colón.


Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido

        v.

Mario García Colón                 CC-2009-912

    Peticionario


Opinión concurrente y disidente emitida por la Juez Asociada señora Rodríguez Rodríguez


San Juan, Puerto Rico, a 10 de junio de 2011

> You just hold your head high and keep those fists down. No matter what anybody says to you, don't let 'em get your goat. Try fighting with your head for a change.
>
> Harper Lee, *To Kill a Mockingbird* (Atticus Finch a su hija Scout)


Concurro con la determinación de la mayoría de revocar la condena del delito de alteración a la paz que pesaba contra el peticionario. Ello no obstante, disiento del criterio mayoritario por dos fundamentos: primero porque coincido con el Juez Presidente señor Hernández Denton en que este proceso

criminal se celebró en violación a las protecciones que emanan del derecho a juicio rápido, por lo que ahí debió concluir el análisis del Tribunal. Segundo, porque la mayoría, en su intento de salvar la disposición penal impugnada, propone una interpretación confusa y contradictoria que desatiende, en ese proceso, la normativa del Tribunal Supremo de Estados Unidos sobre este asunto. Aún cuando considero innecesaria la discusión de la mayoría sobre el delito de alteración a la paz, los errores conceptuales de la opinión mayoritaria me obligan a refutar su desacertado razonamiento.

El error fundamental de la mayoría es que pretende validar el delito de alteración a la paz sin verdaderamente enfrentarse a su contenido y a las deficiencias de nuestros dictámenes anteriores. Lejos de ello, este Tribunal se reitera, mecánicamente, en nuestras expresiones previas sobre la doctrina de palabras de riña, sin reconocer que varios de nuestros dictámenes anteriores claramente eran defectuosos por apartarse de la normativa federal. El resultado de esta ausencia de rigor es que la mayoría adopta un estándar impreciso y discordante, con visos de inconstitucionalidad, sobre cuándo unas palabras pueden tipificarse como palabras de riña y cómo se configura el delito. El peligro del método adoptado por la mayoría es que abre la puerta para restringir el derecho a la libertad de expresión de los ciudadanos al regular más expresión de la permisible.

Finalmente, debo expresar disconformidad y algún grado de inquietud con algunas expresiones de la opinión de la

mayoría, las cuales tienen el potencial -por su imprecisión- de limitarle al ciudadano su capacidad de expresar libremente su descontento y sus agravios sobre el gobierno y sus funcionarios. La mayoría expresa lo siguiente: "Ahora bien, el ejercicio de la libre expresión debe estar **enmarcado dentro del respeto** y la dignidad que ampara a todos los ciudadanos. Así, pues, este derecho no constituye una carta blanca que nos permita **infringir la dignidad** del ser humano." (Énfasis nuestro). ¿Qué nueva limitación le está imponiendo este Tribunal al ejercicio de la libertad de expresión? ¿Qué tipo de expresión es la que falta el respeto? ¿Es que la Primera Enmienda no protege la expresión irrespetuosa e ignominiosa? ¿A base de qué criterio se concluye que este tipo de expresión no está garantizada constitucionalmente? ¿Qué normas van a utilizarse para determinar si una expresión es respetuosa? ¿Cómo se va a implantar este estándar de conducta aceptable? ¿Quién es el guardián de este nuevo código de decoro y decencia?

Sólo hay que recordar e internalizar las más recientes expresiones del Tribunal Supremo de Estados Unidos sobre la libertad de expresión:

> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and -as it did here—inflict great pain. On the facts before us, **we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course -to protect even hurtful speech on public issues to ensure that we do not stifle public debate. (**Énfasis nuestro.)

*Snyder v. Phelps,* 562 U.S. ___ (2011), Núm. 09-751, res. 2 de marzo de 2011.

I

Los hechos de este caso no están en controversia. El 15 de noviembre de 2006, dos oficiales de la Policía detuvieron al señor Mario García Colón por una alegada violación a la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 5001 *et seq.* Durante la intervención, el señor García Colón le expresó a los policías, en dos ocasiones, que éstos eran "unos charlatanes, corruptos y que no valían nada". Por estos hechos, uno de los oficiales procedió a expedirle una citación para que compareciera el 28 de noviembre de 2006 ante el Tribunal de Primera Instancia.

Casi seis meses después, en mayo de 2007, el Ministerio Público presentó denuncias por dos cargos del delito menos grave de alteración a la paz, tipificado en el artículo 247 del Código Penal, 33 L.P.R.A. sec. 4875 ("artículo 247(c)"). El juicio se celebró y el señor García Colón fue hallado culpable por el referido delito. Inconforme, éste acudió al Tribunal de Apelaciones, el cual confirmó la sentencia del Tribunal de Primera Instancia. Aún insatisfecho, el peticionario recurre ante nosotros mediante recurso de *certiorari.*

Entre sus planteamientos, el señor García Colón alegó que el delito de alteración a la paz tipificado en el artículo 247 es inconstitucional debido a que es excesivamente amplio o adolece de vaguedad, ya que no brinda un aviso razonable del tipo de conducta que el delito proscribe y su cobertura se extiende a expresiones protegidas por el derecho a la libertad de expresión. Ello, en

violación a la protección que ofrece el derecho a la libertad de expresión que emana de la sección 4 del artículo II de nuestra Carta Magna. Art. II, Sec. 4, Const. E.L.A., L.P.R.A. 1.

II

La libertad de expresión es uno de los derechos ciudadanos de la más alta jerarquía que reconoce nuestra Constitución. *Muñiz v. Admor. Deporte Hípico*, 156 D.P.R. 18, 24 (2002). El derecho a expresar libremente nuestras ideas, y más importante aún, el derecho a criticar libremente al gobierno, son baluartes fundamentales de una sociedad libre. Es precisamente el ejercicio de este derecho lo que permite salvaguardar los otros derechos que se recogen en nuestra Carta Fundamental. En este sentido, es ilustrativa la siguiente expresión del Juez Black en *Speiser v. Randall*, 357 U.S. 513, 530 (1958): "[the freedoms secured by the First Amendment] are absolutely indispensable for the preservation of a free society."

No obstante, este derecho no es irrestricto. *Muñiz v. Admor. Deporte Hípico*, *ante*, n. 5; R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico,* págs. 1278-79, Vol. II, Ed. Edwards Brothers: Carolina del Norte (1988). Ahora bien, debido al rol preeminente que desempeña este derecho en nuestra vida democrática, al limitar su alcance siempre se deben adoptar aquellas medidas que menos lesionen el derecho del ciudadano a expresarse libremente. *Pueblo v. Santos Vega*, 115 D.P.R. 818, 821 (1984). Tal y como apuntó el Juez Brandeis: "To justify suppression of

free speech there must be reasonable ground to fear that serious evil will result." *Whitney v. California*, 274 U.S. 357, 376 (1927).

Como sabemos, la jurisprudencia del Tribunal Supremo de Estados Unidos sienta el estándar mínimo de protección que podemos conferirle a cualquier derecho constitucional en nuestra jurisdicción bajo nuestra Constitución. Es decir, bajo la Constitución del Estado Libre Asociado de Puerto Rico este Tribunal puede reconocer y proteger más expresión que aquella que protege la Constitución de Estados Unidos, pero nunca menos que en el ámbito federal.

Este caso trata, en su esencia, sobre cuándo el Estado puede válidamente castigar o penar la expresión por su contenido. Conviene iniciar esta discusión reseñando que la deferencia judicial al criterio legislativo cuando se interpreta una legislación que incide sobre la libertad del ciudadano a expresarse es menor que aquella que, de ordinario, ejercemos cuando nos enfrentamos a legislación de carácter económico o social. Cuando la legislación incide sobre la libertad de expresión nuestro análisis tiene que ser riguroso y acucioso debido a los valores preeminentes que subyacen el ejercicio libre de la expresión. *Thomas v. Collins*, 323 U.S. 516, 530 (1945)("The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation …, will not suffice in the case of speech.")

El Tribunal Supremo de Estados Unidos ha formulado dos doctrinas principales para enfrentarse a controversias que

giran en torno a cuándo el Estado puede castigar la expresión por su contenido. La primera, y la que nos atañe hoy, es la llamada doctrina de palabras de riña; y la segunda, la doctrina de peligro claro e inminente ("clear and present danger"). Ambas persiguen proteger al locutor de sanciones penales por el uso de expresiones controversiales, salvo cuando sea muy probable que la expresión vertida produzca un peligro inminente debido a la reacción que dicha expresión produzca sobre el oyente. Una y otra, persiguen imponer barreras a las limitaciones que, válidamente, se puedan establecer al ejercicio de la expresión. M. Mannheimer, *The Fighting Words Doctrine*, 93 Colum. L. Rev. 1527, 1549 (1993). *Véase*, *además*, C. Calvert, *Personalizing First Amendment Jurisprudence: Shifting Audiences & Imagined Communities to Determine Message Protection in Obscenity, Fighting Words, and Defamation*, 20 U. Fla. J.L. & Pub. Pol'y 439 (2009).

En *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), el Tribunal Supremo de Estados Unidos enunció por primera vez una teoría sobre el derecho a la libre expresión que excluía, específicamente, un tipo de expresión del ámbito de su protección, las llamadas palabras de riña. El Tribunal definió las palabras de riña como aquéllas que por el mero hecho de ser proferidas tienden a causar una respuesta violenta inmediata en la persona a quien se dirigen. *Chaplinsky v. New Hampshire, ante,* pág. 572 ("those which by

their very utterance inflict injury or tend to incite an immediate breach of the peace….")[44]

Con posterioridad a *Chaplinsky, ante*, el Tribunal Supremo de Estados Unidos ha refinado su análisis, sosteniendo que la doctrina de palabras de riña se refiere a un diseño limitado y restringido que pretende atender el problema de cómo enfrentar la violencia en que incurre una persona que profiere lenguaje insultante.[45] En este tenor ha adoptado un estándar de análisis de carácter contextual y objetivo. Así, en *Gooding v. Wilson*, 405 U.S. 518 (1972), el Tribunal Supremo sostuvo que al considerar si unas expresiones son o no palabras de riña, hay que evaluar las circunstancias específicas de cada caso para determinar si una persona de inteligencia común consideraría la expresión como susceptible de incitar al receptor de la expresión a responder violentamente al escucharlas. Se requiere algo más que meramente que las palabras proferidas puedan provocar una reacción violenta. Se requiere, en palabras del propio

---

[44] Conviene señalar que en casos posteriores, el Tribunal Supremo de Estados Unidos tuvo a bien **abandonar el criterio de que la expresión de riña es también aquella que inflige un daño**, como había sugerido en *Chaplinsky,* 315 U.S. 568 (1942). *Véase*, *Rosenfeld v. New Jersey*, 408 U.S. 901 (1972).

[45] Curiosamente, en sus decisiones posteriores a *Chaplinsky, ante*, el Tribunal Supremo no ha validado una condena a base de que las expresiones vertidas constituían palabras de riña. Ello ha llevado al profesor Chemerinsky a aseverar lo siguiente: "The cumulative impact of these decisions is to make it unlikely that a fighting words law could survive. If the law is narrow, then it likely would be deemed an impermissible content-based restriction because it outlaws some fighting words, but not others, based on the content of speech. If the law is broad, then it probably would be invalidated on vagueness or overbreadth grounds." E. Chemerinsky, *Constitutional Law Principles and Policies*, Aspen Publishers, 3ra ed., Nueva York, 2006, sec. 11.3.3.2, pág. 1002.

Tribunal Supremo: "that words **were intended to produce and likely to produce inminent disorder**…." (Énfasis nuestro.) *Hess v. Indiana*, 414 U.S. 105, 108-09(1973).

Así, en *Hess v. Indiana, ante*, el Tribunal sostuvo que cuando no existe una amenaza real e inminente de que pueda originarse una reacción violenta en quien escucha la expresión, no se justifica denegarle protección constitucional a las palabras de riña.  Lo mismo ocurre cuando la expresión no se dirige a una persona o un grupo en particular. *Véase*, *Hess v. Indiana*, *ante*, págs. 108-09.

Recalcamos, la determinación de si una expresión se enmarca como "palabras de riña" no depende del efecto real que haya tenido la expresión sobre la persona a quien va dirigida o, de si la expresión, en efecto, originó una respuesta violenta.  Es decir, el hecho que una expresión protegida constitucionalmente pueda originar una respuesta violenta no la convierte en una palabra de riña.  Aunque se trate de lenguaje de crítica, provocativo o insultante, si la expresión no podría tener el efecto de causar un peligro claro e inminente, estamos ante expresiones cobijadas por la protección constitucional. *City of Houston, Tex. v. Hill*, 482 U.S. 451, 460 (1987); *Terminiello v. Chicago*, 337 U.S. 1, 4 (1974).  Y es que las palabras, no son inherentemente peligrosas.  Como señaló el Tribunal Supremo en *Cohen v. California*, 403 U.S. 15, 25 (1971):  "The State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us."

Sostener lo contrario supondría que vivimos en una sociedad *homogenizada* sin espacio para la diversidad.

En *Terminiello v. Chicago*, *ante*, pág. 4, (citas omitidas), el Juez Asociado Douglas nos advierte:

> Accordingly a function of free speech under our system of government **is to invite dispute.** It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stir people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of serious substantive evil that rises far above public inconvenience, annoyance, or unrest. **There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.** (Énfasis nuestro.)

Resumiendo, para que unas expresiones puedan catalogarse válidamente como palabras de riña, los siguientes criterios deben estar presentes, a saber:  primero, que la expresión esté dirigida de forma directa y personal al oyente, quien debe encontrarse ante el locutor (*Cohen v. California, ante; Lewis v. City of New Orleans, ante; Chaplinsky v. New Hampshire, ante*); segundo, y secuela de lo anterior, que las palabras estén dirigidas de forma particular a una persona o a un grupo (*Hess v. Indiana, ante, Cohen v. California, ante*; tercero, que la expresión sea, por su naturaleza, capaz de causar una reacción violenta en una persona de sensibilidad común (*Chaplinsky, ante; Gooding, ante*); y cuarto, que las circunstancias en que las palabras son proferidas deben crear la probabilidad real e inminente que la expresión surta el

efecto que se pretende evitar. (*Hess v. Indiana, ante*) Así, si una expresión no cumple con tales características, no debe catalogarse como palabra de riña.

## III

Por otra parte, debemos considerar también en nuestro análisis la doctrina de imprecisión o vaguedad y amplitud excesiva pues éstas han sido utilizadas por el Tribunal Supremo de Estados Unidos para invalidar condenas basadas en leyes que pretendían prohibir palabras de riña. *E.g., Gooding v. Wilson, ante; Rosenfeld v. New Jersey, ante; Lewis v. City of New Orleans, ante; Brown v. Oklahoma*, 408 U.S. 914 (1972).

La doctrina de vaguedad es un corolario del debido proceso de ley que prohíbe la aplicación de una ley o reglamento cuyos términos no revelan clara y adecuadamente cuál es la conducta prohibida por el estatuto. *Pueblo v. A.P.S. Healthcare*, 2009 T.S.P.R. 11, 175 D.P.R. __ (2009); *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 901 (1987). Así, se ha establecido que una ley adolece de vaguedad si: (1) falla en brindar un aviso suficiente del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta a la aplicación arbitraria y discriminatoria ;e (3) interfiere con el ejercicio de derechos fundamentales garantizados por la constitución. *Boys and Girls Club v. Scrio de Hacienda*, 2010 T.S.P.R. 167, 179 D.P.R. __ (2010); *Pueblo v. A.P.S. Healthcare of P.R., ante; Pacheco Fraticelli v. Cintrón Antosanti*, 122 D.P.R. 229, 240 (1988). Esta doctrina aplica

particularmente al evaluar estatutos penales.  *Pueblo v. A.P.S. Healthcare of P.R.*, *ante.*

De igual manera, un ataque constitucional a una ley bajo la doctrina de imprecisión implica que se ha realizado un análisis adecuado del texto de la ley a la luz del significado jurídico de las palabras, utilizando precedentes judiciales que hubieran interpretado dicho texto y que aún luego de dicho análisis, una persona de inteligencia promedio no queda debidamente advertida de la conducta proscrita.  *Id.*

Es menester advertir que en el caso particular de un estatuto que reglamenta un derecho fundamental como la expresión, la ausencia de guías adecuadas para su implementación es aún más peligrosa pues ello permite que un funcionario arreste o procese a personas únicamente por razón de que discrepa de la idea que se intenta trasmitir con la expresión.  J. Novak, R. Rotunda, *Treatise on Constitutional Law-Substance and Procedure*, 4ta ed., Vol. 5, sec. 20.9(c).

Por su parte, la doctrina de amplitud excesiva opera en supuestos en que a pesar que una ley pretende prohibir o castigar expresiones desprotegidas por la Constitución, su redacción es tal que tiene el efecto de sancionar expresión constitucionalmente protegida por la cláusula de libertad de expresión.  *Pueblo v. A.P.S. Healthcare of P.R., ante*; *U.N.T.S. v. Secretario de Salud*, 133 D.P.R. 153, 161 (1993).[46]  Se trata de leyes cuyos términos son claros pero,

---

[46] La doctrina de amplitud excesiva permite el ataque de una ley de su faz, sin requerir necesariamente que el atacante demuestre que el estatuto es inconstitucional según fue aplicado a su conducta. Ello constituye una excepción a la

de igual forma, su texto sanciona expresiones protegidas en violación a las garantías que ofrece el derecho a expresarse libremente. R. Serrano Geyls, *op. cit.,* pág. 1320.

Esta doctrina cumple el propósito de evitar que un estatuto excesivamente amplio tenga el efecto de que personas cuya expresión se encuentra protegida por la Constitución, se abstengan de ejercer sus derechos debido al temor de que su conducta pueda ser sancionada criminalmente por el estatuto. *Pueblo v. A.P.S. Healthcare of P.R., ante; Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 146 (1973); *Massachusets v. Oakes*, 491 U.S. 576, 581 (1989).

Hemos dispuesto que para invalidar un estatuto bajo este fundamento, la amplitud excesiva debe ser sustancial en relación con el alcance legítimo que la medida pueda tener. *Pueblo v. A.P.S. Healthcare of P.R., ante; Pueblo v. Hernández Colón, ante*, pág. 899. En la jurisdicción federal, *véase, Massachusets v. Oakes, ante*, pág. 581; *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). El análisis bajo esta doctrina debe partir de una lectura del texto del estatuto para determinar, inicialmente, si éste es sustancialmente amplio. *City of Houston, Tex. v. Hill, ante*, pág. 458.

Cabe recordar que el objetivo rector de estas doctrinas es evitar que un estatuto que adolece de imprecisión o que es excesivamente amplio tenga el efecto de suprimir la expresión

---

regla general de que una persona no puede impugnar un estatuto alegando que podría ser inconstitucional de aplicarse en circunstancias distintas a las suyas. *Pueblo v. A.P.S. Healthcare*, 2009 T.S.P.R. 11, 175 D.P.R. ___ (2009), citando a *Vélez v. Mun. de Toa Baja*, 109 D.P.R. 369, 378 (1980).

constitucionalmente protegida. Cónsono con ese propósito, al interpretar un estatuto objeto de un ataque constitucional, debemos ser cuidadosos y no incurrir en el contrasentido de sustituir la amplitud excesiva por una interpretación que adolezca de vaguedad. L.H. Tribe, *American Constitutional Law*, Foundation Press, 2da. ed., sec. 12-29, pág. 1031.[47] Consecuentemente, si el precepto está redactado de manera tal que no permite que éste se interprete de conformidad con los contornos constitucionales aplicables, procede que se declare su inconstitucionalidad. *Véase*, *Massachusets v. Oakes*, *ante*; *Board of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987); *Gooding v. Wilson*, *ante*, págs. 520-521.

De la discusión anterior se desprende que para determinar si un estatuto es inválido de su de su faz por adolecer de amplitud excesiva se requiere, primeramente, que se realice una lectura minuciosa de sus términos y se examine cómo éstos han sido interpretados. Así, se debe evaluar si el estatuto, según redactado, es amplio o adolece de vaguedad por ser susceptible de aplicación a expresión protegida. De contestar dicha interrogante en la afirmativa, procede entonces determinar el carácter de dicha amplitud y, subsiguientemente, resolver si una interpretación razonable del estatuto es suficiente  para disipar las dudas sobre su

---

[47] Tal sería el caso, por ejemplo, de una interpretación que lea: "será delito proferir cualquier expresión en público a menos que la expresión se encuentre protegida por la Primera y Decimocuarta Enmienda". L.H. Tribe, *American Constitutional Law*, Foundation Press, 2da. ed., sec. 12-29, pág. 1031. (Traducción nuestra).

constitucionalidad. De esto último no ser viable, procedería declarar la inconstitucionalidad del estatuto.

Veamos dos ejemplos de cómo el Tribunal Supremo de Estados Unidos ha aplicado esta doctrina en casos en los que se cuestionaba si ciertas expresiones constituían palabras de riña. En *Gooding v. Wilson*, *ante*, el Tribunal invalidó un estatuto penal que, similar al nuestro, penalizaba el uso de palabras *oprobiosas* o de lenguaje *abusivo* que tendiera a ocasionar un quebrantamiento de la paz.[48] *Gooding v. Wilson*, *ante*, pág. 524. En esa ocasión, el tribunal fue enfático al destacar que la definición del término *oprobio* abarcaba expresiones que no constituían palabras de riña, por lo que su inclusión en un estatuto que no ha sido definido ni limitado adecuadamente, convertía al estatuto en uno excesivamente amplio, pues cobija expresiones protegidas.[49]

En *Lewis v. City of New Orleans*, *ante*, el Tribunal nuevamente declaró inconstitucional un estatuto que penalizaba el uso de palabras *oprobiosas*, proferidas contra un miembro de la policía. El Tribunal declaró que no bastaba que el tribunal supremo estatal resolviera que el estatuto que contenía ese lenguaje aplicaba únicamente a palabras de riña, sino que se requería que, en efecto, sus términos se limitasen o se definieran propiamente. *Gooding v. Wilson*,

---

[48] El precepto legal declarado inconstitucional disponía: "[a]ny person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words of abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor". *Gooding v. Wilson*, 405 U.S. 518 (1972).

[49] En esa ocasión, la Corte definió *oprobio* como "conveying or intended to convey disgrace". *Gooding v. Wilson*, *ante*, pág. 525.

*ante*, pág. 132. El máximo foro federal razonó que en ese caso no se definieron los términos del estatuto lo suficiente como para que no aplicara a expresión, que aunque pudiera ser ofensiva o vulgar, estaba protegida por la Constitución. *Lewis v. City of New Orleands, ante,* págs 132-33.

Al decretar la inconstitucionalidad de estas leyes, el Tribunal Supremo tomó en consideración la interpretación conferida a estos estatutos por los tribunales de los estados recurridos, para ver cómo esos foros habían delimitado el alcance de los estatutos impugnados. Luego de ese análisis, el Tribunal Supremo concluyó que los foros estatales habían errado al no limitar la interpretación de la disposición impugnada a palabras que pudieran causar una respuesta violenta. *Lewis v. City of New Orleans, ante; Gooding v. Wilson, ante.*[50]

Lo cierto es que una ley que penaliza la expresión, aunque adolezca de amplitud excesiva, puede validarse si el tribunal interpreta restrictivamente el estatuto. Ello, sin embargo, implicaría que pudiera ser inválida debido a que se imponen limitaciones en función exclusivamente del contenido

---

[50] Sobre declaración de insconstitucionalidad por parte de foros estatales de máxima jerarquía, véase *Christopher Aguilar v. People of Colorado*, 886 P.2d 725 (1994); *Marks v. City of Anchorage*, 500 P.2d 644 (Alaska, 1972); *Commonwealth v. A. Juvenile*, 368 Mass. 580 (1975); *Sate v. Reyes*, 104 Wash.2d 35, 700 P.2d 1155 (Washington, 1985).

En otros estados, los tribunales supremos han sostenido la validez de estatutos similares al de autos, luego de realizar una interpretación restrictiva. *Véase, In the Matter of the Welfare of S.L.J.*, 263 N.W.2d 412 (Minnesota, 1978); *State v. Read*, 165 Vt. 141 (1996); *State v. Huffman*, 228 Kan. 186, 612 P.2d 630 (Kansas, 1980); *State v. Williams*, 205 Conn. 456, 534 A.2d 230 (1987).

de la expresión. *Véase,* sobre este asunto lo que señala el profesor Chemerinsky, nota al calce *2, ante.*

Pasemos ahora a considerar la controversia en este caso.

V

A

El artículo 247 del Código Penal de Puerto Rico que tipifica como delito: "(c) perturb[ar] la paz o tranquilidad de una o varias personas mediante vituperios, oprobios, desafíos, provocaciones o palabras insultantes u ofensivas que puedan provocar una reacción violenta o airosa en quien las escucha." 33 L.P.R.A. sec. 4875. Lo primero que llama la atención del estatuto es la inclusión del concepto *oprobios* en su texto. Ya indicamos que el Tribunal Supremo federal ha resuelto, de forma reiterada, que esta expresión es excesivamente amplia y cobija en su seno expresión protegida.

Por otro lado, la locución *vituperio* se define como "[b]aldón u oprobio que se dice a uno".[51] Es decir, *oprobio* y *vituperio* son sinónimos y, por ende, en su acepción común necesariamente ambos son excesivamente amplios. Valga señalar, que precisamente por esto jurisdicciones estatales de Estados Unidos han optado por eliminar estos vocablos de estatutos relativos a la alteración a la paz.[52] De suyo,

---

[51] Diccionario de la Real Academia Española.

[52] Por ejemplo, a raíz de lo resuelto en *Gooding v. Wilson, ante,* el estado de California enmendó la definición de su delito de alteración a la paz para eliminar toda referencia a oprobio o vituperio y conformarlo con la jurisprudencia federal respecto al tipo de lenguaje que puede válidamente prohibirse. Antes de la enmienda sufrida, la redacción del delito de alteración a la paz de California era casi

ambos vocablos plantean un problema de imprecisión o amplitud excesiva.

Ahora bien, atendiendo el razonamiento utilizado por el Tribunal Supremo de Estados Unidos, veamos nuestras expresiones pasadas sobre estos conceptos para determinar si le hemos conferido un significado de tal forma limitante, que puedan sobrevivir un ataque constitucional.

En *Pueblo v. Ways*, 29 D.P.R. 334 (1921), dictaminamos que llamar a una persona en alta voz "lambe ojo", "fariseo" y "judas" eran vituperios o conducta ofensiva que configuraba el delito de alteración a la paz. En este caso, el término *vituperios* se definió como: "[f]alsear, presentar o exponer a calumnia o ridículo; difamar; calumniar; vilipendiar . . . exponer injustamente a desprecio o vergüenza . . . [b]aldón u

---

idéntica al texto del delito de alteración a la paz de nuestro Código Penal de 1974. *Véase*, J.J. Álvarez González, *Derecho Constitutional de Puerto Rico y Relaciones Constitucionales con los EEUU: Casos y Materiales*, ed. Temis, Bogotá, 2009, págs. 1051-52. El texto actual del Código Penal de California, luego de la enmienda de 1976, lee:

> 415. Any of the following persons shall be punished by imprisonment in the county jail for a period of not more than 90 days, a fine of not more than four hundred dollars ($400), or both such imprisonment and fine:
>
> > (1) Any person who unlawfully fights in a public place or challenges another person in a public place to fight.
> > (2) Any person who maliciously and willfully disturbs another person by loud and unreasonable noise.
> > (3) Any person who uses **offensive words in a public place which are inherently likely to provoke an immediate violent reaction.**

Cal. Penal Code § 415. (Énfasis nuestro.)

**oprobio** que se dice a uno. Acción o circunstancia que causa afrenta o deshonra." *Id*., pág. 338. (Énfasis nuestro.) (Citas y comillas omitidas). De otra parte, definimos conducta ofensiva como "cualquier cosa que causa disgusto, que produce dolor, u origina sensaciones desagradables". *Id.*, pág. 337.

Al agrupar las definiciones de estos términos podemos notar que son tan amplias e imprecisas que pueden incluir cualquier expresión que tenga el efecto de causar *vergüenza, deshonor, deshonra o* constituya *una afrenta.* A la luz de la jurisprudencia federal, estas definiciones resultan excesivamente amplias pues su característica principal es el efecto en la persona que recibe el mensaje, sin tomar en cuenta la naturaleza de la expresión. Existen una infinidad de situaciones en que se puede ridiculizar a una persona mediante palabras, causarle disgusto o provocarle una afrenta, sin que por, su naturaleza, se trate de expresiones que inherentemente provocarían una reacción violenta.

Más de medio siglo después, en *Pueblo v. Caro*, 110 D.P.R. 518 (1980), nos reiteramos en lo resuelto en *Ways*, reafirmándonos en las definiciones del delito de alteración a la paz. En *Caro,* el acusado y convicto, desde el interior de su residencia, profirió las siguientes palabras dirigidas a varios miembros de la policía que habían ido allí a investigar una querella: "La policía que se vaya al carajo, ustedes son unos pendejos. Suban arriba, que les voy a entrar a palos". No hubo contacto ni cercanía física con los policías; éstos no lograron entrar a la residencia, ni Caro

salió de ésta. *Id.*, pág. 520. No obstante, concluimos, al confirmar la condena, que esa expresión "bien puede entenderse que es la que se intenta prohibir en el estatuto como **'vituperios'** o conducta tumultuosa u ofensiva." *Id.*, pág. 522.

Afirmamos que la sola conducta del acusado, al dirigirle vituperios al oficial de la policía, era punible bajo el estatuto **sin que fuera necesario considerar si la expresión conllevaba la probabilidad real e inminente de causar una respuesta violenta inmediata**. *Véase*, *Id.*, págs. 523-24. El señor Caro González fue condenado por sus expresiones aunque **no existía probabilidad real alguna de una reacción violenta inmediata por parte de los oficiales de la Policía, ya que se encontraban separados físicamente por una puerta**. Adviértase también, que la expresión no estuvo dirigida directamente a un policía en particular, sino al grupo que se encontraba fuera de su residencia y que había acudido allí para investigar una querella.

*Caro* ejemplifica las dificultades que aquejan los vocablos que contiene el artículo 247(c) del Código Penal de 2004. Como vimos, *Caro* mantuvo la conceptualización amplia del tipo de expresión punible al citar a *Ways* y acoger esas definiciones, y no consideró el contexto en que se profirió la expresión. Ya indicamos que cuando no hay una amenaza real e inminente de que se pueda provocar una reacción violenta en la persona que escucha la expresión, ésta no constituye palabras de riña. También apuntamos que aquella

expresión proferida que no está dirigida a una persona o grupo en particular, no constituye palabras de riña.

Lo cierto es que es imposible reconciliar *Caro* con lo dispuesto por el Tribunal Supremo de Estados Unidos.  No nos debe sorprender por lo tanto, lo que nos indica el constitucionalista José Julián Álvarez sobre este caso, a saber:

> Igualmente pobre es el análisis (o falta de él) sobre la validez constitucional de la definición de este delito.  Aunque el Tribunal reconoce que casos como *Gooding v. Wilson*, 405 U.S. 518 (1972), invalidaron estatutos estatales similares bajo las doctrinas de imprecisión o amplitud excesiva, no parece reconocer que el mismo defecto aqueja al estatuto puertorriqueño.  *Gooding* resolvió que la proscripción de palabras 'oprobiosas' requería invalidar el estatuto de Georgia.  Otro tanto ocurrió en *Lewis v. New Orleans*, que la opinión de Caro cita en su escolio 13.  ¿Qué diferencia hay entre 'oprobios' y 'vituperios'?  Nótese que una de las definiciones de 'vituperio' que el Tribunal acepta en la parte I es precisamente 'oprobio'.  La definición de 'conducta ofensiva' que el Tribunal acepta es igualmente problemática, a la luz de la decisión en *Rosenfeld*. … Ese caso revocó una condena y devolvió el asunto al tribunal estatal para que se considerara a la luz de lo resuelto en *Gooding*.  La ley en *Rosenfeld* usaba el término 'lenguaje ofensivo.'

J.J. Álvarez González, *op. cit.*, pág. 1051.  *Véase, además*, R. Emmanuelli Jiménez, *Análisis Constitucional del Delito de Alteración a la Paz: Artículo 260 del Código Penal de Puerto Rico*, 55 Rev. Jur. U.P.R. 587 (1986).

Es cuando menos desafortunado, que la mayoría cite con aprobación nuestro dictamen en *Caro*, apuntado que lo allí dispuesto es una interpretación cónsona con la exigencia de la jurisprudencia federal.  Ello no es correcto.  En la medida en que el dictamen en este caso descanse en *Pueblo v.*

*Caro, ante*, la validez de lo que hoy se resuelve está en entredicho. Cabe destacar que con posterioridad a *Caro*, en aquellas ocasiones en que hemos tenido ante nuestra consideración condenas por alteración a la paz, hemos soslayado el planteamiento constitucional y nos hemos enfocado en la prueba presentada para concluir que no se probó el delito imputado.

Ello, no obstante, sí hemos indicado que para que quede configurado el delito de alteración a la paz es necesario que concurran dos elementos, a saber: el *elemento objetivo* y el *subjetivo*. *Pueblo v. Irizarry*, 156 D.P.R. 780, 799 (2002); *Pueblo v. Rodríguez Lugo*, 156 D.P.R. 42 (2002). Ello, en un intento de conformar nuestra jurisprudencia a lo que marca la jurisprudencia del Tribunal Supremo de Estados Unidos.

Así por ejemplo señalamos que para establecer el *elemento objetivo* se debe tomar en cuenta la naturaleza misma de la acción o expresión, la cual, para que se considere ofensiva, tiene que ser de tal grado hiriente e irritante como para poder provocar una respuesta violenta en una persona de sensibilidad ordinaria. *Pueblo v. Irizarry, ante.* De otro lado, para establecer el elemento subjetivo, se atiende al efecto o consecuencias de la conducta ofensiva en la alegada víctima del delito; esto es, si en efecto se le perturbó la paz a la persona a quien se dirigió la referida conducta. *Pueblo v. Irizarry, ante.* Con ello intentamos cumplir con el mandato federal.

B

La Asamblea Legislativa de Puerto Rico intentó, al aprobar el Código Penal de 2004, limitar la aplicación del delito de alteración a la paz para conformarlo con las exigencias constitucionales.[53] De ahí que en el artículo 247(c) se incluyera la frase: "que puedan provocar una reacción violenta o airosa en quien las escucha".[54] No obstante, según redactado, el artículo todavía da margen sustancial a que se aplique a expresión protegida y la interpretación mayoritaria no subsana este problema. Me explico.

---

[53] A esos efectos, la profesora Nevares Muñiz, ha expresado:

> Este nuevo Código . . . presenta una nueva redacción que pretende armonizar el derecho a la libertad de expresión . . . con el derecho que tiene todo ciudadano a la protección de su vida privada o familiar de ataques abusivos a su honra, su reputación, integridad y a su intimidad . . . se ha atemperado el lenguaje . . . **de manera que no se penalice la expresión de palabras por su mero contenido sin considerar el efecto de las mismas sobre otras personas** . . . se ha descartado específicamente el lenguaje de los incisos (a) y (c) del artículo 260 del Código Penal derogado, **donde muchos de los actos proscritos se refieren a palabras que podrían ser ambiguas en cuanto a su interpretación y aplicación.**

D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, Instituto para Desarrollo del Derecho, Inc., 2005, pág. 317. (Énfasis nuestro.)

[54] La modalidad del delito de alteración a la paz tipificada en el artículo 247(c) del Código Penal actual se asemeja al inciso (a) del artículo 260 del Código Penal anterior, el cual tipificaba como delito: (a)perturb[ar] la paz o tranquilidad de algún individuo o vecindario, **con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones.** (Énfasis nuestro.)

De una lectura serena del texto del artículo 247(c) puede constatarse que aun luego de la inclusión de la mencionada apostilla, el texto retuvo las palabras *vituperios*, *oprobios* y *palabras ofensivas*. Ello, como mínimo, tiene el efecto de que el delito continúe originando serias dudas sobre su constitucionalidad al no brindar un aviso suficiente en cuanto a su cobertura y extensión. Por lo que, para evaluar el nuevo texto debemos considerar si la frase introducida subsana los defectos del anterior. Sólo así podría aclararse si la extensa lista de expresiones cobijadas bajo los términos *vituperios* u *oprobios* -la gran mayoría de éstas expresiones protegidas constitucionalmente- quedaron excluidas del marco de aplicación del delito.

Considero que la frase "que puedan provocar una reacción violenta o airosa en quien las escucha" se distancia significativamente de la definición de palabras de riña elaborada por la Corte Suprema federal. Una conducta expresiva "que pueda" provocar una reacción violenta es muy distinta de aquélla que, como exigencia de la jurisprudencia federal, requiere que al ser proferida conlleve la probabilidad inherente de provocar una respuesta violenta inmediata. Esta última expresión es más clara, específica y restrictiva al limitar el tipo conducta expresiva que se intenta penalizar. Por el contrario, el texto incluido en el artículo 247(c), según redactado, continúa adoleciendo de ambigüedad y no cumple con ofrecer un aviso razonable sobre cuáles *vituperios*, *oprobios*, *desafíos*, *provocaciones* o

*palabras insultantes* u *ofensivas*, el estatuto persigue proscribir.

Me parece forzoso concluir entonces, que el artículo 247(c), según redactado, aún genera serias dudas sobre su constitucionalidad, al incluir términos que dieron pie a que la Tribunal Supremo federal invalidara estatutos similares y debido a que, como se indicó, el marco de aplicación del delito no se desprende claramente de su texto. Este artículo, según redactado, es sustancialmente amplio e impreciso y no brinda un aviso razonable acerca de los tipos de conducta que intenta penalizar. Ello apunta a que el problema de su constitucionalidad del artículo 247(c) no quedó subsanado en el nuevo Código Penal y, lamentablemente, este Tribunal no se enfrenta a este asunto.

Como Tribunal Supremo tenemos la facultad de interpretar restrictivamente esta disposición penal para poder así, sostener su validez constitucional. Lamentablemente la mayoría ha fracasado en este intento.

**La Opinión mayoritaria debió reconocer expresamente la conceptualización deficiente de nuestros anteriores precedentes sobre este asunto y proceder a modificarlos, o revocarlos si ello fuera necesario. Luego entonces, la mayoría venía obligada a reconocer que el nuevo texto del artículo 247(c) continuaba padeciendo de un problema de imprecisión y amplitud excesiva por contener un lenguaje que dificulta establecer su marco de aplicación de forma clara.**

Por el contrario, el Tribunal falla al no enfrentar nuestros previos dictámenes en los que interpretábamos

disposiciones penales de otros códigos pero cuyas palabras aún adornan el delito en el nuevo Código Penal, sin advertir la aplicación deficiente del estándar federal en esos casos. Las definiciones del término *vituperio*, según conceptualizado en *Ways,* y reafirmado en *Caro*, no han sido cuestionadas ni abandonadas por este Tribunal. Más aún, la Opinión mayoritaria en este caso opta por citar a *Caro* favorablemente. Es evidente que en nuestra jurisdicción, y en lo relativo al delito de alteración a la paz, los términos *vituperios*, *oprobios y palabras ofensivas* han sido definidos de manera similar. De igual forma, la Opinión mayoritaria no restringe el significado de dichos términos, sino todo lo contrario, al no enfrentarlos, reafirma sus definiciones tradicionales, persistiendo entonces la amplitud y vaguedad que los acompaña.

El Tribunal, como parte de su razonamiento, no encara estas dificultades y, en vez, establece unos parámetros de aplicación del artículo 247(c) en abstracción de éstas. Ello tiene el efecto de empañar su interpretación y matizarla de inconstitucionalidad. Así, *sin hacer camino al andar*, salta a la siguiente conclusión: el texto del artículo 247(c) aplica a todas las expresiones que puedan estar incluidas en los términos *vituperios*, *oprobios*, *desafíos*, *provocaciones* o *palabras ofensivas*, cuando éstas adquieran la característica de palabras de riña. [55]

---

[55] Precisamente, la reafirmación por el Tribunal Supremo de Luisiana respecto a que el estatuto, según escrito, había sido aplicado únicamente a palabras de riña fue el factor que movió a la Corte Suprema de Estados Unidos a enfrentar al

Súmese a ello, que al evaluar las expresiones del señor García Colón para determinar si éstas constituyeron palabras de riña, el Tribunal realiza unos pronunciamientos contradictorios que, como mínimo, tienen el efecto de ofuscar el estándar establecido para evaluar si determinadas expresiones constituyen palabras de riña. Por un lado, el Tribunal parece exponer la definición de palabras de riña correctamente cuando indica que: "las expresiones proferidas por el peticionario -si bien pudieron haber provocado en los policías un sentimiento de molestia y frustración- no constituyeron palabras de riña capaces de provocar una reacción violenta según lo proscribe el Artículo 247(c) del Código Penal". Opinión del Tribunal, pág. 70. No obstante, en otra porción de la Opinión, el Tribunal sugiere que para determinar si determinadas expresiones constituyen palabras de riña se debe tener en cuenta el **efecto que tuvieron las expresiones sobre la persona a quien van dirigidas**. Opinión del Tribunal, pág. 68.

El Tribunal, al resolver así actúa de forma contraria a las exigencias de la jurisprudencia federal, pues, para resolver que las expresiones del señor García Colón no constituyeron palabras de riña, toma en cuenta el efecto que éstas tuvieron sobre los oficiales de la Policía. Estos pronunciamientos son desatinados y abren una brecha peligrosa para que el delito se aplique al margen de la doctrina de la

---

tribunal estatal con su propia jurisprudencia. Así, quedó evidenciado que los términos del estatuto se prestaban para ser aplicados a expresiones protegidas. *Lewis v. City of New Orleans*, *ante*, pág. 132.

palabras de riña pautada por la jurisprudencia federal.  En otras palabras, la expresión y actuación del Tribunal vicia de inconstitucionalidad su propia interpretación del delito y el estándar recién pautado para su configuración.

El Tribunal pasa por alto que el elemento subjetivo del receptor de la expresión sólo debe tomarse en cuenta para constatar si, en efecto, la persona a quien iba dirigida la expresión se encontraba en "estado de tranquilidad" previo a los hechos, lo cual es uno de los elementos del delito de alteración a la paz.  *Véase*, *Pueblo v. Irizarry*, ante; *Pueblo v. De León Martínez*, 132 D.P.R. 746 (1993).  **Sin embargo, ese elemento no debe tomarse en cuenta para determinar si una expresión se puede catalogar como palabra de riña.**

De conformidad con la jurisprudencia federal, en estos casos, la única conducta expresiva que puede configurar el elemento objetivo del artículo 247(c) es aquélla que constituya palabras de riña.  Y para hacer esta determinación inicial, es innecesario evaluar los efectos que tuvo la conducta expresiva como resuelve la mayoría.  Por el contrario, de no configurarse el elemento objetivo del delito, es innecesario evaluar los efectos o consecuencias que tuvo la conducta expresiva sobre la alegada víctima. *Pueblo v. Irizarry*, *ante*, pág. 801.

De lo contrario, bastaría que una persona afirme que sintió el impulso de responder violentamente, para clasificar determinadas expresiones como palabras de riña, con el resultado de que el elemento objetivo del delito quedará configurado.  Más aún, existe un universo de expresiones

comprendidas en los términos del artículo 247(c) que podrían "adquirir la característica de palabras de riña" por el sólo hecho que la persona que las escucha afirme que experimentó el impulso de responder violentamente. El efecto real de lo resuelto por el Tribunal en el día es que la mayoría valida que se sancione más expresión que la que permite se sancione el Tribunal Supremo de Estados Unidos, en perjuicio del ciudadano quien ve, nuevamente, sus derechos acotados.

Por las razones que discuto, concurro con el resultado a que llega la mayoría y disiento de su desafortunado razonamiento.


Anabelle Rodríguez Rodríguez
Juez Asociada